**UNITED STATES DISTRICT COURT**
**DISTRICT OF NORTH DAKOTA**

| | |
|---|---|
| In re:<br><br>**Vanity Shop of Grand Forks, Inc.**,<br><br>Debtor. | Case No.: 17-30112<br><br>Chapter 11<br><br>Related to Docket Nos. 17, 97, 154 |

**SUPPLEMENT TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS LIMITED OBJECTION TO THE DEBTOR'S MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTOR TO PAY AND HONOR CERTAIN PREPETITION WAGES, BENEFITS, AND OTHER COMPENSATION OBLIGATIONS, (II) HONOR MANAGEMENT SERVICES AGREEMENT AND PAY PREPETITION OBLIGATIONS RELATED THERETO, AND (III) AUTHORIZING BANKS TO HONOR AND PROCESS CHECKS AND TRANSFERS RELATING TO SUCH OBLIGATIONS**

The Official Committee of Unsecured Creditors (the "Committee") of Vanity Shop of Grand Forks, Inc., the debtor and debtor-in-possession in this case ("Vanity" or the "Debtor"), by and through its undersigned proposed counsel Fox Rothschild LLP, hereby files this supplement to its previously filed *Limited Objection to the Debtor's Motion for Entry of an Order (I) Authorizing the Debtor to Pay and Honor Certain Prepetition Wages, Benefits, and Other Compensation Obligations, (II) Honor Management Services Agreement and Pay Prepetition Obligations Related Thereto, and (III) Authorizing Banks to Honor and Process Checks and Transfers Relating to Such Obligations* [Docket No. 154] (the "Objection") and in support thereof states as follows:

1. On March 29, 2016, the Debtor filed its *Third Declaration of Jill Motschenbacher in Support of Chapter 11 Petition and First Day Motions* [Docket No. 196] (the "Supplemental Declaration").[1] The declaration helps shed light on the payments that the Debtor proposes to make to Vanity, Inc. However, the Debtor has thus far declined the Committee's requests to engage in further discussions or provide additional documentation regarding its relationship with Vanity, Inc., and significant questions and concerns remain regarding these payments, the Management Agreement, and the Debtor's relationship with Vanity, Inc.

### *I. Where Does the Debtor End and Vanity, Inc. Begin?*

2. It appears that the Debtor's management functions are being conducted exclusively by a non-debtor, in its absolute discretion, free from the oversight of this Court or the fiduciary duties imposed on a Debtor under the Bankruptcy Code.

3. Pursuant to the Management Agreement, Vanity, Inc. provides the Debtor with all of its management, corporate, and administrative employees,[2] and handles all functions relating to "development, strategic, financial and operating matters."[3] These services include maintaining the Debtor's accounting, bookkeeping, and record keeping; reviewing invoices and debt payments; preparing financial statements; maintaining a comprehensive filing system, including vendor invoices and contract files; coordinating the services of legal counsel; strategic planning; preparation of operating and/or cash flow budgets; negotiations with banks, lenders, and investment bankers; and other critical functions.[4]

4. All of the Debtor's own employees, in contrast, are stationed at one of the Debtor's retail store or web fulfillment locations. Vanity, Inc.'s Administrative Employees work

---

[1] All capitalized terms used herein and not otherwise defined have the meanings set forth in the Debtor's *Motion for Entry of an Order (I) Authorizing the Debtor to Pay and Honor Certain Prepetition Wages, Benefits, and Other Compensation Obligations, (II) Honor Management Services Agreement and Pay Prepetition Obligations Related Thereto, and (III) Authorizing Banks to Honor and Process Checks and Transfers Relating to Such Obligations* [Docket No. 17] and the Objection [Docket No. 154].
[2] *Declaration of Jill Motschenbacher in Support of Chapter 11 Petition and First Day Motion* [Docket No. 26].
[3] *See* Management Agreement at Para. 1.1.
[4] *See* Management Agreement at Exhibit A.

2

"alongside" the Debtor's own employees and are "responsible for operating the Debtor on a day-to-day basis."[5]

5. Moreover, Vanity, Inc. provides its services as an independent contractor with "full and complete liberty to use its own free and uncontrolled will, judgment and discretion as to the method and manner of performing the obligations of Vanity" under the Management Agreement.[6]

6. This arrangement leads to a host of serious questions regarding the administration of this bankruptcy case.

- Ms. Motschenbacher's various declarations state that her testimony to this Court is based on her "review of the Debtor's books and records" and "information compiled and communicated to [her] by other employees of the Debtor."[7] How is this possible if the Debtor's employees consist only of sales clerks and fulfilment center employees, and under the Management Agreement it has outsourced the maintenance of books and records to a non-debtor?

- These same questions arise in connection with the Debtor's Schedules of Assets and Liabilities and Statement of Financial Affairs (the "Schedules"), which were prepared "with the assistance of the Debtor's personnel" and "Debtor's management." We are told that the Schedules and Statement of Financial Affairs (the "SOFA") were signed by James Bennett, the Debtor's Chairman, in reliance upon "the efforts, statements and representations of the Debtor's accounting and non-accounting personnel." Yet the Debtor appears to have no accounting personnel and it is unlikely that sales clerks prepared these financial documents. So who did prepare them?[8]

- The Management Agreement further provides that, upon termination of the agreement for any reason (such as, presumably, rejection of the agreement by the Debtor), Vanity, Inc. may "destroy, and certify to [the Debtor] in writing of such destruction, all records, documents, and information and data (including data stored in computers), and all copies of the foregoing" that relate to the Debtor.[9] What assurances do the Debtor, its creditors, and this Court have that records critical to the administration of this case will be preserved?

---

[5] *See* the Declaration of Jill Motschenbacher in Support of Chapter 11 Petition and First Day Motion (the "Global Declaration").

[6] *See* Management Agreement at Para. 4.6.

[7] *See, e.g.,* the *Third Declaration of Jill Motschenbacher in Support of Chapter 11 Petition and First Day Motion* at Para. 4.

[8] *See* Global Notes and Statement of Limitations, Methodology, and Disclaimer Regarding Debtor's Schedules and Statement of Financial Affairs [Docket No. 188] at pg. 1 and pg. 3, Para. 11.

[9] *See* Management Agreement at Para. 3.3.

3

ACTIVE\45073649.v1-3/31/17

- The Debtor has stated without explanation that, should it be required to obtain the services provided by Vanity, Inc. elsewhere, this would create significant additional costs and disruption. But why is that? It is commonplace in liquidating cases for a Debtor's employees to be hired directly by a liquidating trustee, for example, and to continue to provide essential wind down services on a contract basis. The Committee has asked if the Debtor, rather than maintaining the Management Agreement, can directly hire key personnel currently provided by Vanity, Inc. Directly employing these individuals would resolve serious questions by ensuring that the Debtor's management is subject to the oversight of this Court and the US Trustee's Office and the provisions of the Bankruptcy Code. Moreover, Ms. Mochenbacher's declaration indicates that, by April 15th, only roughly 14 employees will remain at Vanity, Inc., making a transition seemingly feasible. But the Debtor has remained silent and has provided no answers.

### *II. Payments Proposed Under the Debtor's Supplemental Declaration*

7. The Supplemental Declaration does help shed light on the payments proposed to be made under the Management Agreement. But additional questions remain.

- The Debtor has indicated, generally, that Vanity, Inc. has terminated and is continuing to terminate employees concurrently with the Debtor's wind down. The Committee appreciates this information and the corresponding reduction in payroll, PTO, and benefits pass-through payments.

    o In view of the concerns raised above regarding the administration of this case, it is essential that the Debtor also disclose, with detail and cost by employee and function, who Vanity, Inc. is continuing to employ, and at what weekly cost. The Debtor should also indicate whether these remaining employees can be hired directly by the Debtor.

    o Regarding the proposed $186,000 in PTO, is this subject to a cap per employee? Is there a detail by employee?

    o Regarding the $22,000 in 401(k) matching payments, is this a discretionary contribution? If so, why is it being continued? Does Vanity, Inc. have a right to suspend further contributions? Why wouldn't Vanity, Inc. have amended the 401(k) plan to allow for reduced contributions?

- The Debtor's budget includes $125,000 in unspecified "retention incentives" for Vanity, Inc.'s personnel. More information is needed to determine whether these payments are in contravention of, or an end-run around, the Bankruptcy Code's restrictions on employee retention payments and the like.

- The Debtor proposes to pay to Vanity, Inc. roughly $64,000 in occupancy costs related to its headquarters and distribution center (*e.g.,* $44,000 in rent, $10,000 in utilities, and $10,000 in copier costs). Vanity, Inc.'s landlord is Apparel Real Estate, LLP, which is owned by undisclosed, various shareholders of Shazzam!, Inc., the Debtor's parent. It is unclear whether, and to what extent, it benefits the Debtor's estate to maintain these leases into April and beyond.

4

- o Based upon square footage, approximately 80% of the rent appears to be attributable to the Debtor's distribution center. Moreover, the Debtor's liquidation budget indicates that inventory should have been moved from the warehouse and distribution center to the Debtor's remaining stores for liquidation prior to March 30, 2017. Even if rent is "at or below market," why is the Debtor paying rent to maintain an empty warehouse? Is the warehouse and office space on a single lease? Or two leases? Can Vanity, Inc. terminate the warehouse lease?

- o Furthermore, Vanity, Inc. will have reduced its employee headcount by 87%, to roughly 14 individuals, by mid-April. Even if the headquarters space is at or below market rates, what steps are being taken to preserve the Debtor's records and to downside to a smaller facility on a month-to-month basis more consistent with the Debtor's liquidation effort, or to negotiate an equivalent rent reduction from Vanity, Inc.?

- The Debtor proposes, without explanation, that Vanity, Inc. is to be paid $35,000 for "supplies and travel." More information is needed to determine whether and to what extent this payment may benefit the Debtor's estate.

- This Court's Interim Order authorized the Debtor to pay to Vanity, Inc. approximately $315,000 in respect of wages, salaries, severance, and accrued PTO pursuant to the Management Agreement, and it is the Committee's understanding that such payments have already been made. These include payments to one unidentified Administrative Employee in excess of the statutory caps set forth in Bankruptcy Code 507(a)(4) and 507(a)(5) (which the Debtor asserts are inapplicable).[10] Who is this individual? What services is he or she providing and what payments were made?

### III. The Debtor's Schedules and SOFA Indicate that Significant Transfers to Vanity, Inc. and Other Insiders May Be Shielded by the Debtor's Disclosures.

8. This Court's order should prohibit not only payments to Shazzam! Inc. shareholders, as set forth in the Supplemental Declaration, but it should also prohibit *any* direct, indirect, or pass-through payments or transfers to any and all statutory or non-statutory insiders absent further Court order.

9. The Debtor has made statements that payments to Vanity, Inc. were simply "pass-through" costs and there were no markups or "management fees" paid to Vanity, Inc. The Debtor also states that no shareholders of Shazzam! Inc. (the Debtor's parent) will be paid

---

[10]   *See* Motion at 16-17.

5

postpetition salary, PTO, or retention incentive payments. These statements are reassuring and a positive first step.

10. One of the Committee's concerns, however, is that the Debtor may have been able to shield benefits to insiders by only listing payments made directly to Vanity, Inc. (or TGC, LLP). A review of the recently filed Schedules and SOFA is instructive. The SOFA indicates that roughly $9.3 million in transfers were provided to insiders of the Debtor in the one year preceding the Petition Date, including Vanity, Inc. as well as Barrier Lake Investments, LLC; Anderson, Bottrell, Sander & Thompson; Bottrell Family Investments, LP; Diamond B Technology Solutions, LLC; and Sales Floor Live.

11. More troubling, the Debtor's SOFA, Question No. 4, states that pursuant to the terms of the Management Agreement, the Debtor "transfers funds to Vanity, Inc. to fund substantially all corporate managements costs."[11] The Schedules further disclose that "prior to the Petition Date, in the ordinary course of business, the Debtor and Vanity, Inc. . . . may have received advances from Debtor to fund its cash needs. In addition, from time to time, the Affiliate would reimburse Debtor for some of those advances. From time to time, in the ordinary course of business, Debtor also makes payments to certain third parties on behalf of the Affiliate. These and other cash and non-cash transactions are included in the invoices documenting the specific transactions between Affiliate and Debtor. It would be unduly burdensome for the Debtor to separately identify each of these transactions for purposes of the Statement of Financial Affairs."

12. To get below the surface of these corporate structures and better understand the extent to which insiders have derived benefits classified as "pass-through costs" the Committee will also be seeking the following information:

---

[11] *See* Schedules [Docket No. 188] at pg. 10.

- Monthly income statements and balance sheet detail for the current fiscal year and two prior fiscal years for Vanity Shop of Grand Forks Inc., Shazzam! Inc., Vanity Inc., and TGC, Inc. (each a "Corporate Entity," and collectively, the "Corporate Entities").

- A detail of Debtor's inter-company payments/transfers made between the Corporate Entities within two years prior to the Petition Date.

- A detail of the Debtor's payments made to Insiders[12] within the two years prior to the Petition Date.

- Any payments by each Corporate Entity made to or on behalf of Theresa Bottrell, Lowell Bottrell; C-Anderson Bottrell; James Bennett; Marnie Kimbrough; Stephen J. Anderson; and Stephen J. Anderson IRA and their direct relatives (each a "Principal," and collectively, the "Principals") within two years prior to the Petition Date, including salary, dividends and distributions, credit cards in the control of these persons, car lease payments, expense reimbursement including travel and entertainment, transfer of goods, etc.

    13.    The Schedules and SOFA raise other questions as well.

- The Schedules indicate that the Debtor has an astonishing $7.755 million in doubtful/uncollectible accounts receivable. One possible explanation could be that Vanity, Inc. owes significant amounts to the Debtor pursuant to the Management Agreement. The Management Fee provided for in the agreement includes not only a cost reimbursement and profitability bonus, but also provides as follows: "If, at the end of its fiscal year, [the Debtor] did not accomplish a positive pre-tax net 'book' income (profit), Vanity will be required to assume an amount equivalent to 75% of [the Debtor's] pre-tax loss. The repayment for the loss will be paid within 90 days of [the Debtor's] fiscal year end." In any event, the Committee will be seeking addition information and answers regarding this A/R balance and its collectability.

- The Schedules state that the Debtor may not have identified certain guarantees associated with the Debtor's executory contracts, unexpired leases, secured financings, debt instruments, and any other such agreements."[13] Has Vanity, Inc. provided any such guarantees?

- The Schedules indicate that "the e-commerce platform utilized by the Debtor was developed by employees of Vanity, Inc." and that the Debtor "is still researching the ownership of this asset."[14] The Committee will be exploring the ownership and value of this potential asset.

- The "employees" listed on Schedule E to the Schedules are "inclusive of direct employees [of the Debtor] and those corporate employees retained pursuant to the Management Services Agreement . . . for purposes of Notice."[15] Similarly, the Debtor

---

[12] "Insider" refers to the definitions provided on the SOFA in Part 13. Questions #29, 30, and 31.
[13] *See* Schedules pg. 10.
[14] *See* Schedules pg. 6.
[15] *See* Schedules pg. 7.

7

ACTIVE\45073649.v1-3/31/17

has not included in SOFA #3 any ordinary course payments for wages…. However, "wages, compensation, or expenses for corporate employees paid pursuant to the Management Agreement are included in the 'Vanity, Inc.' entries."[16] The Committee will be seeking additional information to properly distinguish between employees of the Debtor and employees of Vanity, Inc. in order to ensure that claims against the estate are not overstated.

*Conclusion*

14. The most recent Order entered with respect to the Debtor's motion provides that the "Debtor is authorized, but not directed, to continue performing and exercising rights and obligations under the Management Agreement with Vanity, Inc. including the reimbursement of 100% of direct management costs in accordance with its prepetition ordinary course of business." It further provides that: (a) the "Debtor will not pay any profitability bonus to Vanity, Inc. under the Management Agreement and Vanity Inc. has waived its right to assert an administrative priority claim for any "profitability bonus;" (b) the Debtor "shall not make any payments to shareholders or affiliates after March 23, 2017, *until entry of an order ruling on the Committee's objection*;" and (c) nothing in the Motion or the relief granted shall be construed as a request for authority to assume the Management Services Agreement, waive the Debtor's rights, claims, or defenses under the agreement, or grant third-party beneficiary status of bestow any additional rights on any third party.

15. It is essential that these restrictions be maintained, and that the final Order on the Motion continue to provide not only that, absent further Order of this Court, the Debtor is prohibited from making payments to shareholders of Shazzam! Inc. but that the Debtor is prohibited from making *any* direct, indirect, or pass-through payments or transfers to any and all statutory or non-statutory insiders.

16. Furthermore, the payments identified in Section II, above, should not be authorized unless and until the Debtor addresses the questions raised and establishes that such

---

[16] *See* Schedules pg. 10.

payments will benefit the estate and are not inconsistent with the provisions of the Bankruptcy Code.

17. To protect the integrity of the administration of this case, any further payments to Vanity, Inc. under the Management Agreement should also be conditioned on Vanity, Inc.'s agreement to turn over the Debtor's books and records to the Debtor and its estate and Vanity, Inc. should be prohibited from destroying any such books and records without further Court order.

18. The Order should also make clear, consistent with the Court's prior ruling at the interim hearing, that the Committee's rights to challenge any payments or transfers under or in connection with the Management Agreement as fraudulent transfers or preferences are fully preserved.

Date: March 31, 2017

**FOX ROTHSCHILD LLP**

By: /s/ Mette H. Kurth
Mette H. Kurth (CA #187100)
1800 Century Park East, Suite 300
Los Angeles, CA 90067-1506
Telephone: (310) 228-4402
Facsimile: (310) 556-9828
E-Mail: *mkurth@foxrothschild.com*

-and-

Ellie Barragry (MN #395207)
Campbell Mithun Tower, Suite 2000
222 South Ninth Street
Minneapolis, Minnesota 55402-3338
Telephone: (612) 607-7000
Fax Telephone: (612) 607-7100
E-Mail: *ebarragry@foxrothschild.com*

*Proposed Counsel to the Official Committee of Unsecured Creditors*

9

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served on March 31, 2017 by this Court's CM/ECF System on all parties receiving electronic notice in this case.

/s/ Mette H. Kurth
METTE H. KURTH