# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NORTH DAKOTA

| In Re: | Case No.:  17-30112 |
|---|---|
| Vanity Shop of Grand Forks, Inc., | Chapter 11 |
| Debtor. | |

## NOTICE OF HEARINGS AND MOTION FOR ENTRY OF AN ORDER, PURSUANT TO 11 U.S.C. §§ 105 AND 363, (I) APPROVING BID/SALE PROCEDURES, (II) AUTHORIZING THE SALE OF CERTAIN INTELLECTUAL PROPERTY FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, AND (III) GRANTING RELATED RELIEF

TO:     ALL CREDITORS AND ALL PARTIES IN INTEREST:

NOTICE IS HEREBY GIVEN that the above referenced Debtor has filed a Motion for Entry of an Order, Pursuant to 11 U.S.C. §§ 105 and 363, (i) Approving Bid/Sale Procedures, (ii) Authorizing the Sale of Certain Intellectual Property Free and Clear of Liens, Claims, Encumbrances, and Other Interests, and (iii) Granting Related Relief (the "**Motion**").  A copy of the Motion is attached and served upon you.

### Hearing on Approval of Bid/Sale Procedures

A hearing on the Motion with respect to the approval of the bid/sale procedures has been set for **Tuesday, October 17, 2017, at 9:30 a.m. in Courtroom #3, Second Floor, Quentin N. Burdick United States Courthouse, 655 First Avenue North, Fargo, North Dakota.**

NOTICE IS FURTHER GIVEN that written objections to the bid/sale procedures, if any shall be filed with the Clerk of the US Bankruptcy Court, Quentin N. Burdick Courthouse, 655 1st Avenue North, Suite 201, Fargo, North Dakota 58102-4932, with a copy served on the attorney for the debtor, the trustee, and all other interested parties listed below within

FOURTEEN (14) days from the date of the mailing of this notice.  Any objections not filed and served may be deemed waived.

## Hearing on Authorizing the Sale of Intellectual Property Free and Clear of Liens, Claims, Encumbrances, and Other Interests

A hearing on the Motion with respect to the authorizing of the sale of certain intellectual property free and clear of liens, claims and encumbrances has been set for **Thursday, October 26, 2017, at 9:30 a.m. in Courtroom #3, Second Floor, Quentin N. Burdick United States Courthouse, 655 First Avenue North, Fargo, North Dakota.**

NOTICE IS FURTHER GIVEN that written objections to said Motion, if any shall be filed with the Clerk of the US Bankruptcy Court, Quentin N. Burdick Courthouse, 655 1st Avenue North, Suite 201, Fargo, North Dakota 58102-4932, with a copy served on the attorney for the debtor, the trustee, and all other interested parties listed below within TWENTY-ONE (21) days from the date of the mailing of this notice.  Any objections not filed and served may be deemed waived.

Dated this 3rd day of October, 2017.

**VOGEL LAW FIRM**

BY: */s/ Caren W. Stanley*
      Jon R. Brakke (#03554)
      jbrakke@vogellaw.com
      Caren W. Stanley (#06100)
      cstanley@vogellaw.com
      218 NP Avenue
      PO Box 1389
      Fargo, ND  58107-1389
      Telephone:  701.237.6983
      *COUNSEL TO DEBTOR IN POSSESSION*

3040048.1

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| In Re: | Case No.:  17-30112 |
| | Chapter 11 |
| Vanity Shop of Grand Forks, Inc., | |
| Debtor. | |

**DEBTOR'S MOTION FOR ENTRY OF AN ORDER, PURSUANT TO 11 U.S.C. §§ 105 AND 363, (I) APPROVING BID/SALE PROCEDURES, (II) AUTHORIZING THE SALE OF CERTAIN INTELLECTUAL PROPERTY FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, AND (III) GRANTING RELATED RELIEF**

Vanity Shop of Grand Forks, Inc. ("**Debtor**") in the above-captioned chapter 11 case hereby moves the Court (the "**Motion**") for entry of an order ("**Order**"), substantially in the form attached hereto as **Exhibit A**, pursuant to Sections 105(a) and 363 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 ("**Bankruptcy Code**"), Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure ("**Bankruptcy Rules**"): (i) approving bid/sale procedures, (ii) authorizing the sale ("**Sale**") of certain intellectual property (the "**Intellectual Property**") on an "as is, where is" basis, free and clear of all liens, claims, encumbrances, and interests, in the entity or entities (each, a "**Purchaser**") that submit the highest or otherwise best offer for the Intellectual Property as determined by the Debtor in its business judgment pursuant to the solicitation and auction process described below, and (iii) granting related relief. In support of this Motion, the Debtor respectfully represents as follows:

### JURISDICTION AND VENUE

1.      The Court has jurisdiction over this Chapter 11 case and this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b), and

Debtor consents to entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution. Venue of this Chapter 11 case and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are Sections 105(a) and 363 of the Bankruptcy Code, and Bankruptcy Rules 2002, 6004 and 9014.

## BACKGROUND

3.      On March 1, 2017 (the "**Petition Date**"), the Debtor commenced a voluntary case under chapter 11 of the Bankruptcy Code. The Debtor is authorized to operate its business and manage its property as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. To date, no trustee or examiner has been appointed in this Chapter 11 case. A statutory committee for the unsecured creditors has been appointed.

4.      Additional factual background relating to the Debtor's business, capital structure, and the commencement of this Chapter 11 case is set forth in detail in the Declaration of Jill Motschenbacher in Support of Chapter 11 Petition and First Day Motions ("**Motschenbacher Declaration**"), which is incorporated herein by reference. [Doc. 026] As further detailed in the Motschenbacher Declaration, the Debtor determined the best way to maximize value for the benefit of all interested parties was a prompt and orderly wind-down of the business through the implementation of store closing sales and related liquidation initiatives.

5.      Accordingly, the Debtor conducted and finished its store closing sales pursuant to this Court's Final Order Granting Debtor's Motion (I) Authorizing the Debtor to Assume The Consulting Agreement, (II) Authorizing and Approving The Conduct of Store Closing Sales,

With Such Sales to be Free and Clear of all Liens, Claims and Encumbrances, and (III) Granting Related Relief [Doc. 172].

6.      Pursuant to the most recent Monthly Operating Report, the Debtor has approximately $7,250,102.67 in cash as of August 26, 2017 available for payment of administrative expenses and for distribution to creditors upon confirmation of a plan of reorganization. [Doc. 424]

<u>**SALE OF INTELLECTUAL PROPERTY**</u>

7.      In connection with its retail operation, the Debtor has developed and utilized the Intellectual Property, which consists of trademarks, domain names, customer files and related data, including, among other things, the digital assets associated with the e-commerce website operated by the Debtor at www.vanity.com and www.vanity.net.

8.      The Debtor filed an application to engage Hilco IP Services LLC d/b/a Hilco Streambank ("**Hilco Streambank**") as its Intellectual Property Disposition Consultant *nunc pro tunc* to May 12, 2017 [Doc. 292]. On June 16, 2017 an order Approving the Retention and Employment of Hilco Streambank was entered by the Bankruptcy Court [Doc. 315] Upon its retention, Hilco Streambank immediately began extensive marketing and due diligence efforts on the sale of the Intellectual Property and began to solicit interest in a sale of all or a portion of the Debtor's Intellectual Property. That process is ongoing and will continue up to the date of an auction. Additionally, the Debtor filed an application to engage Diamond B Technology Services, LLC ("**DBTS**") to assist Hilco Streambank as the IT Consultant *nunc pro tunc* to May 12, 2017 [Doc. 306] . On August 2, 2017 the Bankruptcy Court entered an order Approving the Employment of DBTS as IT Consultant  [Doc. 341]

9.      Hilco Streambank's marketing and due diligence efforts included the following:

3

A.      Developed an initial list of potential buyers that were specifically targeted for an initial outreach via email and telephone. Marketing materials were sent to 213 potentially interested parties.

B.      Developed a virtual data room with the assistance of DBTS to demonstrate the ecommerce platform to potential buyers.

C.      Attended the Name Summit Digital Branding Conference in New York from 8/6/17 – 8/8/17 and directly distributed marketing materials to attendees.

D.      Non-disclosure agreements were signed by ten (10) entities to review the virtual data room.

E.      The Debtor and Hilco Streambank engaged in extensive negotiations with potential purchasers regarding assuming the role of a "Stalking Horse" bidder for the purchase of substantially all of the Debtor's Intellectual Property and received a proposal from one party for a limited purchase of the domain name and the Vanity trademark.

10.      As a result of Hilco Streambank's efforts, the  ultimately  received two "Stalking Horse" bids covering different subsets of the Intellectual Property.  The first bid is from Media Options S.A. ("**Media Options**") which, as set forth in the Asset Purchase Agreement ("**Media Options APA**") annexed hereto as **Exhibit B**, provides for $100,000 cash consideration for the Debtor's interests in the Vanity.com® trademark (USPTO Registration No. 4865304) and two domain names: www.vanity.com and www.vanity.net (collectively, the "**Media Options Assets**"). Pursuant to the Media Options APA, the Debtor has agreed, subject to Court approval, to pay to Media Options a Break-Up Fee of $5,000 in the event it is overbid at the Auction and an alternative buyer is selected as the Successful Bidder for the Media Options Assets.

4

11.    The second "Stalking Horse" bid is from Maurices Incorporated ("**Maurices**") which, as set forth in the Asset Purchase Agreement ("**Maurices APA**") annexed hereto as **Exhibit C**,[1] provides for $75,000 cash consideration for the Debtor's interests in the Vanity® trademark (USPTO Registration Nos. 4973696, 4973695, 3717668, 3717553, 3701029, 3717667, 3691530, 3691596, 3691531, 3691529, 3691515, 3691496, 1891144, 1800825, 1780669), the domain names www.evanity.com and www.vanityshops.com, and the Debtor's customer files (collectively, the "**Maurices Assets**").  Pursuant to the Maurices APA, the Debtor has agreed, subject to Court approval, to pay to Maurices a Break-Up Fee of $7,500 in the event it is overbid at the Auction and an alternative buyer is selected as the Successful Bidder for the Maurices Assets.

12.    Accordingly, the Debtor believes it is in the best interest of the estate and creditors to implement the bidding and sale procedures (the "**Bid/Sale Procedures**") summarized below and, accordingly, will be requesting the Court approve the Bid/Sale Procedures prior to the bid deadline and auction.

## THE PROPOSED BID/SALE PROCEDURES

13.    The Debtor proposes to sell the Intellectual Property assets either in whole or part through one or more sale transactions pursuant to the terms of a purchase agreement (or agreements) to be negotiated by and between the Debtor and proposed purchaser(s) and executed upon completion of one or more auctions for the Intellectual Property (each, an "**Auction**"). In conjunction with the Auction(s), the Debtor proposes to implement the Bid/Sale Procedures described below in an effort to maximize the realizable value of the Intellectual Property for the benefit of the Debtor's estate, creditors, and other interested parties. The Bid/Sale Procedures

---

[1] Debtor will e-file the fully-executed Maurices APA on ECF as soon as it is received.

5

contemplate an Auction process pursuant to which bids for the Intellectual Property will be subject to higher or better offers. The Debtor is seeking approval of Court-sanctioned bidding procedures in advance at the hearing scheduled for **Tuesday, October 17, 2017 at 9:30 CST** (the "**Bid/Sale Procedures Hearing**"). The Debtor intends to conduct the Auction(s) pursuant to court-approved Bid/Sale Procedures prior to the hearing on this Motion scheduled for **October 26, 2017 at 9:30 CST** (the "**Sale Hearing**"), so as to derive maximum value for such assets, and then presenting evidence with respect to the sale process and winning bid(s) at the Sale Hearing. As described more fully below, only bidders who timely submit Qualified Bids (as defined below) may be eligible to participate in the Auction(s).

14.    Specifically, the Debtor intends to implement the following Bid/Sale Procedures on substantially the terms set forth below, for the Sale of the Intellectual Property and conduct the Auction(s) in accordance therewith:

A.    **Bid/Sale Procedures Hearing:  October 17, 2017 at 9:30 a.m. CST**

B.    **Bid Deadline: October 23, 2017 at 5:00 p.m. CST**[2]

C.    Qualified Bid. The Debtor will require a qualified bid (a "**Qualified Bid**") to meet the following requirements:  (i) enclose a proposed purchase agreement (the "**Purchase Agreement**") that specifically identifies the Intellectual Property proposed to be purchased, which may be all or a portion of the Intellectual Property, and the proposed consideration; (ii) confirm that the offer shall remain open and irrevocable until the closing of a Sale to the Successful Bidder or the Next Highest Bidder (as defined herein); (iii) provide cash consideration in a minimum amount of (a) $115,000.00 for the Media

---

[2] Interested parties wishing to bid on the Intellectual Property should contact David Peress and Dmitriy Chemlin at Hilco Streambank: dperess@hilcoglobal.com and dchemlin@hilcoglobal.com.

Options Assets, (b) $90,000.00 for the Maurices Assets, and (c) $205,000.00 for any offer that includes both the Media Options Assets and the Maurices Assets; (iv) be accompanied by a certified or bank check or wire transfer in an amount equal to 10% of the purchase price identified in the Purchase Agreement as a minimum good faith deposit (the "**Minimum Deposit**"), which Minimum Deposit shall be used to fund a portion of the purchase price provided for in the bid; (v) not be conditioned on obtaining financing or the outcome of any due diligence by the bidder; (vi) not request or entitle the bidder to any break-up fee, expense reimbursement, or similar type of payment; and (vii) fully disclose the identity of each entity that will be bidding for the Intellectual Property or otherwise participating in connection with such bid, and the complete terms of any such participation.

D.      <u>Auction(s)</u>.  If the Debtor receives more than one Qualified Bid for the Intellectual Property (or certain subset of the Intellectual Property, including the Media Options Assets and the Maurices Assets), the Auction(s), with respect to the Sale will commence at the Vogel Law Firm, 218 NP Ave, Fargo ND 58107 on **October 25, 2017 at 10:00 a.m. (CST)**, or such later time and place as the Debtor may provide so long as such change is communicated reasonably in advance by the Debtor to all bidders, and other invitees. Debtor will also allow telephonic bids and will provide the phone conference dial-in to interested bidders upon request.

E.      <u>Auction Rules</u>. If one or more Auctions are held, the following rules for its conduct will be observed: (i) only a bidder who has submitted a Qualified Bid by the Bid Deadline (a "**Qualified Bidder**") will be eligible to participate at the Auction; (ii) a minimum Qualified Bid amount for the Intellectual Property, or any subset of the

Intellectual Property, may be announced and/or posted prior to the Auction. Such minimum Qualified Bid amounts may be established based upon a variety of factors, including, but not limited to, the highest bids received prior to the Auction; (iii) at the Auction, Qualified Bidders will be permitted to increase their bids, and bidding at the Auction will continue until such time as the highest or otherwise best offer is determined in accordance with these Bid/Sale Procedures or until such Auction is adjourned by the Debtor. Reasonable notice of the time and place for the resumption of the Auction will be given to all Qualified Bidders and counsel to any statutory committee appointed in this Chapter 11 case; (iv) immediately prior to concluding the Auction, the Debtor shall (a) review each Qualified Bid on the basis of its financial and contractual terms and the factors relevant to the Sale process and the best interests of the Debtor's estate and creditors; (b) determine and identify the highest or otherwise best Qualified Bid (the "**Successful Bid**") and the Qualified Bidder submitting such bid (the "**Successful Bidder**"); (c) determine and identify the next highest or otherwise best Qualified Bid after the Successful Bid (the "**Next Highest Bid**") and the Qualified Bidder submitting such bid (the "**Next Highest Bidder**"); and (d) have the right to reject any and all bids; and (v) within one business day of the completion of the Auction, the Successful Bidder shall complete and execute all agreements, instruments, or other documents evidencing and containing the terms and conditions upon which the Successful Bid was made.

      F.    <u>Acceptance of Successful Bid</u>. If an Auction is held, the Debtors shall be deemed to have accepted a Qualified Bid only when (i) such bid is declared the Successful Bid on the record at the Auction and (ii) definitive documentation has been executed in respect thereof. Such acceptance is conditioned upon approval by the Court

of the Successful Bid and the entry of an Order approving the Sale and such Successful Bid.

G.    <u>Notice of Successful Bid(s)</u>. As soon as reasonably practicable following the conclusion of the Auction(s), the Debtors shall file a Notice of Successful Bid(s). The Notice of Successful Bid(s) shall identify the identity of the Successful Bidder(s), the amount of the Successful Bid(s), and shall include a substantially final version of the Purchase Agreement.

H.    **Sale Hearing: October 26, 2017 at 9:30 a.m. (CST)**

I.    <u>Reservation of Rights</u>. The Debtors reserve the right to seek approval of the Sale of portions of the Intellectual Property through separate Purchase Agreements with different purchasers in the event that the combination of such Sales is determined by the Debtor to obtain the highest value for the Intellectual Property. The Debtor further reserves the right as it may reasonably determine to be in the best interests of its estate to: (i) determine which bidders are Qualified Bidders; (ii) determine which bids are Qualified Bids; (iii) determine which Qualified Bid is the highest and best proposal and which is the next highest and best proposal, (iv) reject any bid that is (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bid/Sale Procedures or the requirements of the Bankruptcy Code or (c) contrary to the best interests of the Debtor and its estate; (v) remove some or all of the Intellectual Property from the Auction(s); (vi) enter into one or more stalking horse agreements; (vii) waive terms and conditions set forth in these Bid/Sale Procedures with respect to all potential bidders; (viii) impose additional terms and conditions with respect to all potential bidders; (ix) extend the deadlines set forth herein; (x) adjourn or cancel the Auction(s) and/or Sale Hearing in

open court without further notice; and (xi) modify the Bid/Sale Procedures as it may determine to be in the best interests of its estate or to withdraw this Motion at any time with or without prejudice.

15.    The Debtor believes that the process contemplated hereby will foster a competitive bidding atmosphere that will generate significant value for its estate.

## CONSUMER PRIVACY OMBUDSMAN

16.    The Debtor has consulted with the Office of the United States Trustee for the District of North Dakota (the "**U.S. Trustee**") regarding the proposed sale of the Intellectual Property and the potential implications such sale has, if any, with respect to the Debtor's privacy policy and the sale of customer data that includes Personally Identifiable Information. As a result thereof, the U.S. Trustee has indicated it will suggest a consumer privacy ombudsperson (the "**CPO**") who, the Debtor understands, will be appointed in the near term. The Debtor intends to work cooperatively with the CPO on the timeline contemplated.

## RELIEF REQUESTED

17.    By this Motion, the Debtor seeks entry of an order (i) approving bid/sale procedures, (ii) authorizing the Sale of the Debtor's Intellectual Property free and clear of liens, claims, encumbrances, and interests pursuant to one or more Purchase Agreements executed by and between the Debtor and the Purchaser(s), and (iii) granting related relief.

## BASIS FOR RELIEF REQUESTED

18.    For the reasons explained below and throughout this Motion, the Debtor's decision to sell the Intellectual Property is a sound exercise of the Debtor's business judgment. The Debtor is confident that the aforementioned process will generate the highest value for the Intellectual Process because (i) the Debtor and Hilco Streambank are actively marketing, and will continue to market, the Intellectual Property to all known and likely purchasers, (ii) the

Auction(s) will foster a competitive bidding process through which the highest and best offer will be generated, and (iii) the Bid/Sale Procedures offer maximum flexibility and security to the Debtor in conjunction with selling the Intellectual Property in an expedited and value-maximizing manner.

       *A.*     ***Sales of the Intellectual Property Should Be Approved.***

      19.      Section 363(b)(1) of the Bankruptcy Code provides:  "The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 105(a) of the Bankruptcy Code provides: "The Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). In pertinent part, Bankruptcy Rule 6004 states that, "all sales not in the ordinary course of business may be by private sale or by public auction." Fed. R. Bankr. P. 6004(f)(1). With respect to the notice required in connection with a sale, Bankruptcy Rule 2002(c)(1) states, in pertinent part, that,

> the notice of a proposed use, sale or lease of property...shall include the time and place of any public sale, the terms and conditions of any private sale and the deadline  for  filing objections. The notice of a proposed use, sale or lease of property, including real estate, is sufficient if it generally describes the property.

Fed. R. Bankr. P. 2002(c)(1).

      20.      To approve the use, sale, or lease of property outside the ordinary course of business, the Court must find "some articulated business justification" for the proposed action. *See In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 145-47 (3d Cir. 1986) (implicitly adopting the "articulated business justification" and good-faith tests of *Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983)); *see also In re Del. & Hudson  Ry. Co.*, 124 B.R. 169, 175–76 (D. Del. 1991) (concluding that the Third Circuit had adopted a "sound business purpose" test in *Abbotts Dairies*); *accord Four B. Corp. v. Food Barn*

*Stores, Inc. (In re Food Barn Stores, Inc.),* 107 F.3d 558, 567 n. 16 (8th Cir. 1997); *In re Crystalin LLC*, 293 B.R. 455, 463-64 (8th Cir. BAP 2003).

21.    Generally, courts have applied four factors in determining whether a sale of a debtor's assets should be approved:  (i) whether a sound business reason exists for the proposed transaction; (ii) whether fair and reasonable consideration is provided; (iii) whether the transaction has been proposed and negotiated in good faith; and (iv) whether adequate and reasonable notice is provided. *See Lionel*, 722 F.2d at 1071 (setting forth the "sound business purpose" test); *Abbotts Dairies*, 788 F.2d at 145–57 (implicitly adopting the articulated business justification test and adding the "good faith" requirement).

22.    Here, the Sale of the Intellectual Property meets these requirements and, accordingly, the Debtor submits it should be approved. The implementation of the Bid/Sale Procedures and Auction process as outlined herein will generate maximum interest in the Intellectual Property, thereby yielding the highest and best bids for such assets. Accordingly, the Debtor submits that the proposed Sale will be the culmination of a thorough and exhaustive marketing process, and that the decision to sell the Intellectual Property to the Purchaser(s) is adequately informed, reasonable, and in the best interests of the Debtor, its estate, and other stakeholders.

   i)    ***The Sale Pursuant to Stalking Horse Bids is a Sound Exercise of the Debtor's Business Judgment.***

23.    There is ample business justification to sell the Intellectual Property as set forth herein, and as such, an order granting the relief requested is a matter within the discretion of the Court and would be consistent with the provisions of the Bankruptcy Code. *See* 11 U.S.C. § 105(a).

### ii)      The Proposed Bid/Sale Procedures are Fair and Reasonable.

24.      The Debtor will implement the Bid/Sale Procedures because the Bid/Sale Procedures are designed to maximize the value received for the Intellectual Property. The procedures the Debtor will allow for a timely Auction process while providing bidders and consultants with ample time and information to submit a timely Qualified Bid. The Bid/Sale Procedures are designed to ensure that the Intellectual Property will be sold for the highest or otherwise best possible purchase price under the circumstances of this Chapter 11 case. The Debtor shall  continue to subject the value of the Intellectual Property to market testing, and by permitting prospective purchasers to bid on the Intellectual Property, the Debtor shall ensure that the ultimate Sale price is an accurate reflection of the Intellectual Property's true value. Similar procedures, pursuant to which liquidating Chapter 11 debtors solicit bids and implement an auction process without first seeking court approval thereof, have been implemented in other Chapter 11 cases. *See e.g., In re The Wet Seal*, Case No. 17-10229 (CSS) (Bankr. D. Del 2017); *In re Gander Mountain*, Case No. 17-30673 (MER) (Bankr. D. Minn. 2017). In this case, the Court has set a hearing date of October 17, 2017 at 9:30 a.m. C.S.T. to give all parties in interest the opportunity to be heard regarding the proposed Bid/Sale Procedures prior to the actual Auction(s). Accordingly, the Debtor and all parties in interest can be assured that the consideration received for the Intellectual Property will be fair and reasonable, and the second prong of the *Abbotts Dairies* standard is satisfied. As discussed below, the "good faith" prong of the *Abbotts Dairies* standard is also satisfied in this instance.

### iii)     The Proposed Stalking Horse Sales have been Proposed and Negotiated in Good Faith.

25.      As previously discussed (paragraph 9 above), the Debtor has worked diligently with Hilco Streambank and DBTS to market the Intellectual Property. Hilco Streambank

provided marketing materials to a targeted market, ten (10) non-disclosure agreements were executed, and Hilco Streambank and the Debtor engaged in extensive negotiations with the two Stalking Horse bidders. The negotiations were conducted in good faith and at arms length. Accordingly, the third prong of the *Abbotts Dairies* standard is satisfied.

### *(iv)      Adequate and Reasonable Notice of the Sales has been Provided.*

26.      The Debtor will be providing notice of the sale to all creditors, with the exception of former employees that are not believed to be creditors (and were included in the matrix for notice only purposes). Accordingly, the Debtor submits that the final prong of the *Abbotts Dairies* standard of providing adequate notice has been satisfied.

### B.      *Sale of the Intellectual Property should be Free and Clear of Encumbrances.*

27.      In accordance with section 363(f) of the Bankruptcy Code, a debtor in possession may sell property "free and clear of any interest in such property of an entity other than the estate" if one of the following conditions is satisfied:

(1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2) such entity consents;

(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4) such interest is in a bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

14

28.     The Debtor does not have any known liens, claims, or encumbrances with respect to the Intellectual Property at this time because the primary secured lien creditor, Wells Fargo, has been paid off and TGC, LLC has acknowledged that its claim is unsecured by filing a proof of claim that indicates it is unsecured. Because the Debtor expects to satisfy one or more of the requirements of section 363(f), as will be demonstrated at the Sale Hearing, approval of the sale of the Debtor's Intellectual Property free and clear of all interests is warranted.

29.     Accordingly, the Debtor requests that the order approving the sale of the Intellectual Property provide that such sale is free and clear of all liens, claims, and encumbrances in accordance with section 363(f) of the Bankruptcy Code.

30.     In addition, the Debtor requests that an order approving the sale include the protections provided in section 363(m) of the Bankruptcy Code. The Debtor will demonstrate at the Sale Hearing that the Successful Bidder(s) is not an "insider" of the Debtor, as that term is defined in section 101(31) of the Bankruptcy Code. Further, Debtor will demonstrate that the purchase agreement with the Successful Bidder(s) is a product of arm's length, good-faith negotiations, and thus the granting of the requested sections 363(m) and 363(n) protections is entirely appropriate under the circumstances.

## REQUEST FOR RELIEF UNDER BANKRUPTCY RULES 6004(H) AND 6006(D)

31.     Bankruptcy Rules 6004(h) and 6006(d) provide, in substance, that an order authorizing the sale of a debtor's property is stayed for a period of 14 days after entry of the order unless the court orders otherwise. The Debtor requests that any order approving the relief requested herein be effective immediately, by providing that the 14-day stay is inapplicable. There is no just reason for delaying the effectiveness of the order.

15

## NOTICE

32.     Notice of this Motion has been given to (i) the U.S. Trustee; (ii) counsel for the Unsecured Creditors Committee; (iii) all parties who have filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002; and (iv) all creditors identified on the matrix with the exception of former employees that are not believed to be creditors of Debtor in accordance with the Court's Order limiting notice of date September 29, 2017 [Doc. 428]. The Debtor submits that no other and further notice is required.

## CONCLUSION

33.     WHEREFORE, the Debtor respectfully requests that the Court enter an order substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein and such other and further relief as is just and proper.

Dated this 3rd day of October, 2017.

**VOGEL LAW FIRM**

BY: */s/ Caren W. Stanley*
　　　Jon R. Brakke (#03554)
　　　jbrakke@vogellaw.com
　　　Caren W. Stanley (#06100)
　　　cstanley@vogellaw.com
　　　218 NP Avenue
　　　PO Box 1389
　　　Fargo, ND  58107-1389
　　　Telephone:  701.237.6983
　　　*COUNSEL TO DEBTOR IN POSSESSION*

# EXHIBIT A

**(Proposed Order)**

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NORTH DAKOTA**

| | |
|---|---|
| In Re: | Case No.:  17-30112 |
| | Chapter 11 |
| Vanity Shop of Grand Forks, Inc., | |
| Debtor. | |

**ORDER, PURSUANT TO 11 U.S.C. §§ 105 AND 363, (I) AUTHORIZING THE SALE OF
CERTAIN INTELLECTUAL PROPERTY FREE AND CLEAR OF LIENS, CLAIMS,
ENCUMBRANCES, AND OTHER INTERESTS, AND (II) GRANTING RELATED
RELIEF**

Upon consideration of the motion (the "**Motion**") by Vanity Shop of Grand Forks, Inc.

("**Debtor**") for entry of an order, pursuant to pursuant to 105(a) and 363 of title 11 of the United

States Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**"), and Rules 2002, 6004, and 9014

of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), (i) authorizing the

Sale of the Intellectual Property on an "as is, where is" basis, free and clear of all liens, claims,

encumbrances, and interests, to the purchaser (the "**Purchaser**") identified in the Purchase

Agreement, dated [_____], 2017, annexed hereto as **Exhibit 1** and (ii) granting related relief;

and this Court having determined that the relief requested in the Motion is in the best interests of

the Debtor, its estate, creditors, and other parties in interest; and due and adequate notice of the

Motion having been given; and upon the entire record in this Chapter 11 case; and after due

deliberation thereon, and good and sufficient cause appearing therefor, it is hereby

**FOUND AND DETERMINED THAT:**

A.      The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

B.      This Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 1334 and 157. This is a core matter pursuant to 28 U.S.C. § 157(b)(2), and this Court may enter a final order consistent with Article III of the United States Constitution. Venue of this Chapter 11 case and of the Motion is proper pursuant to 28. U.S.C. §§ 1408 and 1409.

C.      The statutory predicates for the relief sought in the Motion are sections 105 and 363 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 9014.

D.      Due and adequate notice of the Motion, the proposed Sale, the Sale Hearing, and the subject matter thereof has been provided to all parties in interest herein, and no other or further notice is necessary. A reasonable opportunity to object or be heard with respect to the Motion and the relief requested therein has been afforded to all interested persons and entities.

E.      The relief requested in the Motion is in the best interests of the Debtor, its estate, creditors, and other parties in interest. The Debtor has demonstrated good, sufficient, and sound business purposes and justifications for the relief requested in the Motion.

F.      The Sale was negotiated and proposed in good faith, from arms'-length bargaining positions, and without collusion. The Purchaser is a good-faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and is entitled to the protection thereof. Neither the Debtor nor the Purchaser has engaged in any conduct that

2

would cause or permit the sale of the Intellectual Property to the Purchaser to be avoided under section 363(n) of the Bankruptcy Code.

G.    The consideration provided by the Purchaser to the Debtor for the Intellectual Property (i) is fair and reasonable, (ii) is the highest or best offer for the Intellectual Property, (iii) will provide a greater recovery for the Debtor's creditors than would be provided by any other available alternative, and (iv) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, or possession.

H.    The Debtor is authorized to sell the Intellectual Property to the Purchaser free and clear of all liens, claims, interests, and encumbrances of any kind or nature whatsoever, with such liens, claims, interests, and encumbrances transferring and attaching to the proceeds of the Sale with the same validity and priority as such interests had in the Intellectual Property immediately prior to the consummation of the Sale, because one or more of the standards set forth in sections 363(f)(1)–(5) of the Bankruptcy Code have been satisfied. Those holders of any liens, claims, interests, and encumbrances who did not object to the Motion or the relief requested therein, or who interposed and then withdrew their objections, are deemed to have consented to the Sale pursuant to section 363(f)(2) of the Bankruptcy Code. Those holders of liens, claims, interests, and encumbrances who did object fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are adequately protected by having their interests, if any, attach to the proceeds of the Sale of the Intellectual Property.

I.    [Placeholder for Ombudsman Findings, if any.]

IT IS HEREBY ORDERED:

3

1.      The Motion is granted as set forth herein.

2.      All objections to the Motion or relief provided herein that have not been withdrawn, waived, or settled are hereby overruled and denied on the merits.

3.      Pursuant to sections 105 and 363 of the Bankruptcy Code and the terms of the Purchase Agreement annexed hereto as **Exhibit 1**, the Debtor is hereby authorized to sell, transfer, and convey the Intellectual Property to the Purchaser.

4.      The Intellectual Property sold pursuant to the Purchase Agreement to the Purchaser is being sold "AS IS-WHERE IS," without any representations or warranties from the Debtor as to the quality or fitness of such assets for either their intended or any other purposes.

5.      The Intellectual Property shall be sold free and clear of all liens, mortgages, leases, or other rights or claims of right to use or occupancy, encumbrances, security interest, claims, charges, or other legal or equitable encumbrances and any other matter affecting title (collectively, "**Liens**"), with any Liens in such Intellectual Property, or the proceeds thereof, to attach to the proceeds of such sale with the same validity, priority, and effect as they have against the Intellectual Property.

6.      Pursuant to section 363(b) of the Bankruptcy Code, the Debtor and the Purchaser, as well as their officers, employees, and agents, shall be, and hereby are, authorized to take any and all actions and/or execute any and all documents as may be necessary or desirable to consummate the transactions contemplated by the Purchase Agreement. Any actions taken by the Debtor and the Purchaser necessary or desirable to consummate such transaction prior to the entry of this Order are hereby ratified.

7.      The Court shall retain exclusive jurisdiction to resolve any dispute arising from or relating to the Sales or this Order.

4

Dated: _____

_____

SHON HASTINGS
UNITED STATES BANKRUPTCY JUDGE

**<u>EXHIBIT B</u>**

**(Media Options APA)**

INTELLECTUAL PROPERTY ASSET PURCHASE AGREEMENT

THIS INTELLECTUAL PROPERTY ASSET PURCHASE AGREEMENT (this "**Agreement**"") is made as of September 27, 2017 (the "**Effective Date**") by and between Media Options S.A. ("**Buyer**"), and Vanity Shop of Grand Forks, Inc. ("**Seller**"). Capitalized terms used herein and not otherwise defined herein have the meaning set forth in Article I.

## RECITALS

WHEREAS, Seller was engaged in the business of operating clothing retail stores and an online retail business;

WHEREAS, on March 1, 2017, Seller filed a voluntary petition for relief (the "**Filing**") commencing a case under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of North Dakota (the "**Bankruptcy Court**"):

WHEREAS, Buyer has delivered to Seller an amount in cash (such amount, as it may be adjusted pursuant hereto, the "**Minimum Deposit**") in immediately available funds pursuant to the terms of an escrow agreement, attached hereto as Exhibit A (the "**Escrow Agreement**"), by and between the Buyer and Seller;

WHEREAS, Seller believes, following consultation with Seller's retained consultants, and consideration of available alternatives, that, in light of the current circumstances, a sale of certain of Seller's intellectual property assets as provided herein is necessary to preserve and maximize value, and is in the best interest of Seller, Seller's creditors, and stakeholders;

WHEREAS, Seller desires to sell to Buyer all of the Acquired Assets (defined below) and transfer to Buyer the Assumed Liabilities (defined below) and Buyer desires to purchase from Seller all of the Acquired Assets and assume all of the Assumed Liabilities, in each case upon the terms and conditions hereinafter set forth;

WHEREAS, the execution and delivery of this Agreement and Seller's ability to consummate the transactions set forth in this Agreement are subject to, among other things, the entry of the Sale Order under, inter alia, Sections 363 and 365 of the Bankruptcy Code; and

WHEREAS, the Parties desire to consummate the proposed transaction as promptly as practicable after the Bankruptcy Court enters the Sale Order.

NOW, THEREFORE, in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged and intending to be legally bound hereby, the Parties agree as follows:

3032399.1

# ARTICLE I
## DEFINITIONS

Section 1.1    Definitions. For purposes of this Agreement, the following terms have the meaning specified or referenced below.

"Acquired Assets" shall have the meaning set forth in Section 2.1.

"Affiliate" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, such other Person. For purposes of this definition, "control" when used with respect to any Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, and the terms " controlling" and " controlled" have correlative meanings.

"Agreement" shall have the meaning set forth in the Preamble.

"Allocation Schedule" shall have the meaning set forth in Section 3.5(a).

"Alternative Transaction" means a transaction or series of related transactions (whether by asset sale, equity purchase, merger or otherwise) pursuant to which Seller enters into an agreement to sell all of the Acquired Assets or any group of assets that includes all or any material portion of the Acquired Assets to a Third Party.

"Assumed Liabilities" shall have the meaning set forth in Section 2.3.

"Available Assets" shall mean the assets in the schedule annexed to the Sale Motion .

"Auction" shall mean the auction of the Acquired Assets.

"Avoidance Actions" means any and all claims for relief of Seller under chapter 5 of the Bankruptcy Code, or state fraudulent conveyance, fraudulent transfer or other similar state laws.

"Bankruptcy Case" means, collectively, the bankruptcy cases commenced by Seller under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court in the Filing.

"Bankruptcy Code" means Title 11 of the United States Code, Section 101 et seq.

"Bankruptcy Court" shall have the meaning set forth in the Recitals.

"Business Day" means any day of the year, other than a Saturday or Sunday, on which national banking institutions in New York, New York are open to the public for conducting business and are not required or authorized by Law to close.

"Buyer" shall have the meaning set forth in the Preamble.

"Buyer Termination Notice" shall have the meaning set forth in Section 11.1(c)(i).

"Cash Consideration" means $100,000.

"Claims" means all claims, causes of action, rights of recovery (including rights of indemnity, warranty rights, rights of contribution, rights to refunds and rights to reimbursement) and rights of set-off, in each case, of whatever kind or description against any Person.

"Closing" shall have the meaning set forth in Section 4.1.

"Closing Date" shall have the meaning set forth in Section 4.1.

"Closing Legal Impediment" shall have the meaning set forth in Section 9.3.

"Code" means the Internal Revenue Code of 1986, as amended.

"Contract" means any contract, agreement, undertaking, license, sublicense, sales order, purchase order or other commitment, whether written or oral (including commitments to enter into any of such), that is binding on any Person or any part of its property under applicable Law.

"Copyrights" means: (a) works of authorship whether or not copyrightable; and (b) any other copyrights, copyrightable subject matter and works, whether registered or unregistered, together with all rights to register and obtain renewals and extensions of copyright registrations and all common law rights, and any applications and registrations, as well as all moral rights, therefor.

"Documents" means all books, records, files, invoices, inventory records, product specifications, customer lists and other customer-related information, cost and pricing information, supplier lists, business plans, personnel records, catalogs, customer literature, quality control records and manuals and credit records of customers relating to any Intellectual Property, including all data and other information stored on hard drives (including those located on remote servers, whether operated by Seller or by Third Party providers), discs, tapes or other media.

"Domain Names" means any domain names and uniform resource locators.

"Effective Date" shall have the meaning set forth in the Preamble.

"Encumbrance" means any charge, lien, claim, mortgage, lease, sublease, hypothecation, deed of trust, pledge, security interest, option, right of use or possession, right of first offer or first refusal, easement, servitude, restrictive covenant, encroachment, encumbrance, or other similar restriction of any kind.

"Escrow Agent" shall have the meaning set forth in the Recitals.

"Escrow Agreement" shall have the meaning set forth in the Recitals.

"Excluded Assets" shall have the meaning set forth in Section 2.2.

3

3032399.1

"Excluded Liabilities" shall have the meaning set forth in Section 2.3.

"Filing" shall have the meaning set forth in the Recitals.

"Governmental Authority" means any United States federal, state, municipal or local or any foreign government, governmental agency or authority, or regulatory or administrative authority, or any court, tribunal or judicial body having jurisdiction, including the Bankruptcy Court.

"Governmental Authorization" means any approval, consent, license, permit, waiver or other authorization issued granted or otherwise made available by or under the authority of any Governmental Authority.

"Intellectual Property" means the Seller's trademark – Vanity.com (USPTO registration number 4865304) and the Seller's domain names – VANITY.COM and VANITY.NET and all rights and remedies related to any of the foregoing, including the right to sue for and recover damages, profits and any other remedy in connection therewith, for past, present or future infringement, misappropriation or other violation related to any of the foregoing.

"Knowledge" means, with respect to any matter in question, in the case of Seller, the actual knowledge (or the knowledge that would be obtained after due and reasonable inquiry) of James Bennett, with respect to such matter.

"Law" means any foreign or domestic law, statute, code, ordinance, rule, regulation, order, judgment, writ, stipulation, award, injunction or decree by any Governmental Authority.

"Liability" means any debt, loss, claim, damage, demand, fine, judgment, penalty, liability or obligation (whether direct or indirect, known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, matured or unmatured, determined or determinable, liquidated or unliquidated, or due or to become due and whether in contract, tort, strict liability, successor liability or otherwise) and including all costs and expenses relating thereto (including fees and expenses of legal counsel, experts, engineers and consultants and costs of investigations).

"Material Adverse Effect" means any effect, change, condition, circumstance, development or event that, individually or in the aggregate with all other effects, changes, conditions, circumstances, developments and events has had, or would reasonably be expected to have, a material adverse effect on (a) the Intellectual Property of Seller or (b) the ability of Seller to consummate the transactions contemplated hereby on a timely bases, taken as a whole, excluding any effect, change, condition, circumstance, development or event that results from or arises out of: (i) geopolitical conditions or any outbreak or escalation of hostilities or acts of terrorism or war or any effect, change or event that is otherwise generally applicable to the industries and markets in which Seller operate; (ii) changes in Laws or binding accounting regulations or principles; (iii) the Bankruptcy Case, including, without limitation, the Auction and any announced liquidation of Seller or any of Seller's respective assets; or (iv) any action expressly contemplated by this Agreement or taken at the written request of Buyer, except

4

pursuant to Sections 5.3 or 7.2; provided, however, that any effect, change, condition, circumstances, development or event referred to in clauses (i) through (iv) immediately above shall be taken into account in determining whether a Material Adverse Effect has occurred or would reasonable be expected to occur to the extent that such effect, change, condition, circumstances, development or event has a disproportionate effect on the Acquired Assets.

"Minimum Deposit" shall have the meaning set forth in the Recitals.

"Next Highest Bidder" means the Person submitting a bid at the Auction that is the highest bid immediately before submission of the bid submitted by the Successful Bidder.

"Order" means any award, writ, injunction, judgment, order or decree entered, issued, made or rendered by any Governmental Authority.

"Outside Date" shall have the meaning set forth in Section 11.1(b)(ii).

"Party" or "Parties" means, individually or collectively, Buyer and Seller.

"Patents" means (a) any patent (including certificates of invention and other patent equivalents), (b) any patent applications, (c) any provisional, continuation, continuation-in-part and divisional patent applications based on any of the foregoing, and (d) any patents issuing from any of the items reference in the foregoing clauses (a)-(c), as well as any continuations, continuations-in-part, divisions, extensions, reexaminations, reissues, renewals, patent disclosures, technology, inventions (whether or not patentable or reduced to practice) or improvements thereto.

"Permitted Encumbrances" means Encumbrances set forth on Schedule 1.1(a).

"Person" means any individual, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, estate, trust, association, organization or other entity or Governmental Authority.

"Proceeding" means any action, arbitration, audit, hearing, investigation, litigation, or suit (whether civil criminal, administrative or investigative) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Authority.

"Purchase Price" has the meaning set forth in Section 3.1.

"Qualified Bid" shall have the meaning set forth in the Sale Procedures.

"Representative" means, with respect to a particular Person, any director, officer, employee, agent, consultant, advisor or other representative of such Person, including legal counsel, accountants and financial advisors.

"Sale Hearing" means the hearing conducted by the Bankruptcy Court to approve the transactions contemplated by this Agreement.

"Sale Motion" shall mean the motion filed by the Seller seeking approval of the sale of the Available Assets.

"Sale Order" means an Order of the Bankruptcy Court approving this Agreement and the transactions contemplated hereby, which Order shall be substantially in the form attached hereto as Exhibit B. with such changes as are not adverse to Buyer or as the Parties may mutually agree.

"Sale Procedures" shall mean those sale procedures for the Auction as set forth in the Sale Motion.

"Seller" shall have the meaning set forth in the Preamble.

"Seller Termination Notice" shall have the meaning set forth in Section ll.1(d)(i).

"Subsidiary" means any entity with respect to which a specified Person (or a Subsidiary thereof) has the power, through the ownership of securities or otherwise, to elect a majority of the directors or similar managing body.

"Successful Bidder" means the Person submitting the bid determined to be the highest or best offer at the Auction.

"Tax" or "Taxes" means any federal, state, provincial, local, municipal, foreign or other income, alternative, minimum, add-on minimum, accumulated earnings, personal holding company, franchise, capital stock, net worth, capital, profits, intangibles, windfall profits, gross receipts, value added, sales, use, goods and services, excise, customs duties, transfer, conveyance, mortgage, registration, stamp, documentary, recording, premium, severance, environmental (including taxes under Section 59A of the Code),natural resources, real property, personal property, ad valorem, intangibles, rent, occupancy, license, occupational, employment, unemployment insurance, social security, disability, workers' compensation, payroll, health care, withholding, estimated or other similar tax, duty, levy or other governmental charge or assessment or deficiency thereof (including all interest and penalties thereon and additions thereto), in each case imposed by any Governmental Authority.

"Tax Return" means any return, declaration, report, claim for refund, information return or other document (including any related or supporting estimates, elections, schedules, statements, or information) filed with or required to be filed with any Governmental Authority in connection with the determination, assessment or collection of any Tax or the administration of any laws, regulations or administrative requirements relating to any Tax.

"Third Party" means a Person who or which is neither a Party nor an Affiliate of a Party.

"Trademarks" means all trade names, trade dress, business names, logos, slogans, designs, trademarks and service marks (common law or otherwise), trademark and service mark registrations and applications therefor, and all other indicia of source of goods and services, designs and logotypes relating to the above, in any and all forms, whether registered or

6

unregistered, and registrations and pending applications to register the foregoing (including intent to use applications), as well as all goodwill appurtenant to any or all of the foregoing,.

"Transaction Documents" means this Agreement, the Escrow Agreement, and any other agreements, instruments or documents entered into pursuant to this Agreement.

"Transfer Taxes" shall have the meaning set forth in Section 8.1(a).

Section 1.2 Other Definitions and Interpretive Matters.

(a)    Unless otherwise indicated to the contrary in this Agreement by the context or use thereof:

(i)    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a day other than a Business Day, the period in question shall end on the next succeeding Business Day.

(ii)    Any reference in this Agreement to $ means U.S. dollars.

(iii)    Unless the context otherwise requires, all capitalized terms used in the Exhibits and Schedules shall have the respective meanings assigned in this Agreement. No reference to or disclosure of any item or other matter in the Exhibits and Schedules shall be construed as an admission or indication that such item or other matter is material or that such item or other matter is required to be referred to or disclosed in the Exhibits and Schedules. No disclosure in the Exhibits and Schedules relating to any possible breach or violation of any Contract or Law shall be construed as an admission or indication that any such breach or violation exists or has actually occurred. Any information, item, or other disclosures set forth in any Schedule shall be deemed to have been set forth in all other applicable Schedules if the relevance of such disclosure to such other Schedule is reasonably apparent from the facts specified in such disclosure. All Exhibits and Schedules attached or annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.

(iv)    Any reference in this Agreement to gender includes all genders, and words importing the singular number also include the plural and vice versa.

(v)    The provision of a table of contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in the construction or interpretation of this Agreement. All references in this Agreement to any "Section," "Article," "Schedule," or "Exhibit" are to the corresponding Section, Article, Schedule, or Exhibit of or to this Agreement unless otherwise specified.

7

(vi)    Words such as "herein," "hereof" and "hereunder" refer to this Agreement as whole and not merely to a subdivision in which such words appear, unless the context otherwise requires.

(vii)    The word "including" or any variation thereof means "including, without limitation," and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(b)    No Strict Construction. Buyer, on the one hand, and Seller, on the other hand, participated jointly in the negotiation and drafting of this Agreement, and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by Buyer, on the one hand, and Seller, on the other hand, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement. Without limitation as to the foregoing, no rule of strict construction construing ambiguities against the draftsperson shall be applied against any Person with respect to this Agreement.

## ARTICLE II
## PURCHASE AND SALE

Section 2.1    Purchase and Sale of the Acquired Assets. Upon the terms and subject to the conditions of this Agreement, on the Closing Date, Seller shall sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to Buyer, and Buyer shall purchase, all right, title, and interest of Seller, free and clear of Encumbrances other than Permitted Encumbrances, in, to, or under (collectively, the "Acquired Assets"):

(a)    the Intellectual Property;

(b)    all Documents associated with the right to use the assets referenced in this Section 2.1:

(c)    all goodwill associated with the assets referenced in this Section 2.1:

(d)    all Claims of Seller (other than Avoidance Actions) to the extent arising out of, or relating to, the assets referenced in this Section 2.1: and

(e)    to the extent transferable (including transfers permitted with notice and consent), all rights of Seller under non-disclosure or confidentiality, non-compete, or non-solicitation Contracts relating to any asset referenced in this Section 2.1.

Section 2.2    Excluded Assets. Notwithstanding anything herein to the contrary, the Buyer shall acquire no right, title, or interest in any assets, properties, rights, interests, or claims of any kind or description of Seller that are not Acquired Assets (collectively, the "Excluded Assets").

8

Section 2.3    Assumed Liabilities. Upon the terms and subject to the conditions of this Agreement, at the Closing, Buyer shall assume and agree to perform and discharge, when due (in accordance with their respective terms and subject to the respective conditions thereof) all Liabilities arising from the ownership of the Acquired Assets and the use thereof by Buyer after the Closing (collectively, the "Assumed Liabilities"). Notwithstanding the foregoing or any provision in this Agreement to the contrary, Buyer shall (a) only assume the Assumed Liabilities to the extent such Assumed Liabilities (i) arise after the Closing Date and do not arise from or relate to any breach, default, negligence, willful misconduct or fault by or of Seller and (ii) do not arise from or relate to any event, circumstance or condition occurring or existing on or prior to the Closing Date that, with notice or lapse of time would constitute or result in a breach, default, negligence, willful misconduct or fault by or of Seller, and (b) not assume and shall not be obligated to assume or be obliged to pay, perform, or otherwise discharge, and Seller shall be solely and exclusively liable with respect to, any Liability of Seller that is not an Assumed Liability (such Liabilities, collectively, the "Excluded Liabilities").

Section 2.4    Further Assurances. At the Closing, Seller shall, at its own cost and expense and upon Buyer's request, execute and deliver to Buyer such other instruments of transfer as shall be reasonably necessary to vest in Buyer title to the Acquired Assets, and Seller, on the one hand, and Buyer, on the other hand, shall, at their own cost and expense, use their respective commercially reasonable efforts to take, or cause to be taken, all appropriate action, do or cause to be done all things necessary under applicable Law, and execute and deliver such instruments and documents and to take such other actions, as may be required to consummate the transactions contemplated by this Agreement at or after the Closing; provided that nothing in this Section 2.4 shall prohibit Seller from continuing the cessation of or the winding up of Seller's affairs following the Closing. In furtherance and not in limitation of the foregoing, in the event that any of the Acquired Assets shall not have been conveyed at Closing, Seller shall, at its own cost and expense, use commercially reasonable efforts to convey such Acquired Assets to Buyer as promptly as practicable after the Closing.

## ARTICLE III
## PURCHASE PRICE

Section 3.1    Purchase Price. The purchase price (the "Purchase Price") for the purchase, sale, assignment and conveyance of Seller's right, title, and interest in, to, and under the Acquired Assets shall consist of:

(a)    cash in the amount of the Cash Consideration; and

(b)    the assumption of the Assumed Liabilities.

Section 3.2    Minimum Deposit. Buyer has delivered to the Escrow Agent the Minimum Deposit in immediately available funds pursuant to the Escrow Agreement. The Minimum Deposit shall not be subject to any lien, attachment, trustee process, or any other judicial process of any creditor of Seller or Buyer. The Minimum Deposit shall be retained by Seller at the Closing (and deducted from the Purchase Price due and payable at the Closing), or if

9

this Agreement is terminated, treated in the manner set forth in Section 11.2. All costs associated with the Escrow Agreement shall be borne as follows: (a) each of Seller and Buyer shall bear its respective costs incurred in connection with the Escrow Agreement, including the negotiation thereof, and (b) each of Seller and Buyer shall bear fifty percent (50%) of the fees charged by the applicable Escrow Agent.

Section 3.3    Closing Date Payments. At the Closing, (a) Buyer shall pay to Seller cash by wire transfer of immediately available funds in an amount equal to the Cash Consideration minus the Minimum Deposit and (b) Buyer and Seller shall direct the Escrow Agent to indefeasibly transfer the Minimum Deposit to an account designated by Seller.

Section 3.4    Discharge of Assumed Liabilities After Closing. Following the Closing, Buyer shall pay, perform or satisfy the Assumed Liabilities from time to time and as such Assumed Liabilities become due and payable or are required to be performed or satisfied in accordance with their respective terms.

Section 3.5    Allocation of Purchase Price.

(a)    No later than ten (10) days following the Closing Date, Buyer shall deliver to Seller an allocation schedule(s) allocating the Purchase Price (as may be adjusted pursuant to the terms of this Agreement) among the Acquired Assets of Seller, including the Assumed Liabilities to the extent such Liabilities are required to be treated as part of the purchase price for Tax purposes in accordance with Section 1060 of the Code (the "Allocation Schedule"). Such Allocation Schedule shall become final, binding and conclusive upon Seller and Buyer on the 30th day following Seller's receipt of such statement, unless prior to such 30th day Seller delivers to Buyer a written notice disputing such Allocation Schedule that sets forth what Seller believes represent the proper allocation of the Purchase Price and Assumed Liabilities among the Acquired Assets. If Seller delivers such a dispute notice, then Buyer and Seller shall seek in good faith to agree upon the proper allocation under Section 1060 of the Code during the ten-day period beginning on the date Buyer receives such dispute notice. If such an agreement cannot be reached during such ten-day period, then, within ten days thereafter. Buyer, on the one hand, and Seller, on the other hand, shall jointly engage and submit the unresolved dispute to a nationally recognized independent registered public accounting firm appointed by mutual agreement of Buyer and Seller, or, if they are unable to agree, selected by the Bankruptcy Court. Buyer and Seller shall use each of their reasonable best efforts to cause such firm to issue such firm's written determination regarding the proper allocation under Section 1060 as applicable to the terms of this Agreement within fifteen days after such dispute is submitted. Each Party shall use commercially reasonable efforts to furnish to such firm such work papers and other documents and information as such firm may reasonably request. The determination of such firm shall be final, binding and conclusive upon Buyer and Seller absent manifest error. The Allocation Schedule shall be revised in accordance with Section 1060 of the Code to appropriately take into account any additional payments made under this Agreement following the foregoing determination.

10

(b)     In administering any Proceeding, the Bankruptcy Court shall not be required to apply the Allocation Schedule(s) in determining the manner in which the Purchase Price should be allocated as between Seller and Seller's estates. Buyer and Seller will each file all Tax Returns (including IRS Forms 8594) consistent with the Allocation Schedule(s) established in accordance with this Section 3.5. Seller, on the one hand, and Buyer, on the other hand, each agree to provide the other promptly with any other information required to complete IRS Forms 8594. Neither Buyer nor Seller shall take any Tax position inconsistent with such Allocation Schedule, and neither Buyer nor Seller shall agree to any proposed adjustment based upon or arising out of Allocation Schedule by any Governmental Authority without first giving the other Party prior written notice; provided, however, that nothing contained herein shall prevent Buyer or Seller from settling any proposed deficiency or adjustment by any Governmental Authority based upon or arising out of the Allocation Schedule, and neither Buyer nor Seller shall be required to litigate before any court any proposed deficiency or adjustment by any Governmental Authority based upon or arising out of such Allocation Schedule.

## ARTICLE IV
## CLOSING

Section 4.1     Closing Date. Upon the terms and subject to the conditions hereof, the closing of the sale of the Acquired Assets and the assumption of the Assumed Liabilities contemplated hereby (the "Closing") shall take place at the offices of Vogel Law Firm, 218 N.P. Avenue, Fargo, North Dakota, no later than the first (1st) Business Day following the date on which the conditions set forth in Article IX and Article X have been satisfied or (if permissible) waived (other than the conditions that by their nature are to be satisfied by actions taken at the Closing, but subject to the satisfaction or (if permissible) waiver of such conditions), or at such other place or time as Buyer and Seller may mutually agree. The date and time at which the Closing actually occurs is referred to as the "Closing Date."

Section 4.2     Buyer's Deliveries. At the Closing, Buyer shall deliver to Seller:

(a)     the closing date payment in accordance with clause (a) of Section 3.3:

(b)     each other Transaction Document not previously executed to which Buyer is a party, duly executed by Buyer;

(c)     the certificates of Buyer to be received by Seller pursuant to Sections 10.1 and 10.2: and

(d)     such assignments and other good and sufficient instruments of assumption and transfer, in form reasonably satisfactory to Seller, as Seller may reasonably request to transfer and assign the Acquired Assets and Assumed Liabilities to Buyer.

Section 4.3     Seller's Deliveries. At the Closing, Seller shall deliver to Buyer:

(a)     each other Transaction Document to which Seller is a party, duly executed by Seller;

11

3032399.1

(b)      a copy of the Sale Order entered by the Bankruptcy Court;

(c)      the certificates of Seller to be received by Buyer pursuant to Sections 9.1 and 9.2: and

(d)      such bills of sale, deeds, endorsements, assignments, UCC terminations and other filings and other good and sufficient instruments, in form reasonably satisfactory to Buyer, which are necessary to vest in Buyer all the right, title and interest of Seller in, to or under any or all of the Acquired Assets free and clear of Encumbrances other than Permitted Encumbrances.

**ARTICLE V**
**REPRESENTATIONS AND WARRANTIES OF SELLER**

Except as set forth in the Schedules, Seller hereby represents and warrants to Buyer that the statements contained in this Article V are true and correct as of the date hereof and shall be true and correct in all material respects as of the Closing Date (other than (i) such representations and warranties that are expressly made as of another date which shall have been true and correct as of such date and (ii) any representations and warranties limited by materiality which shall be true and correct in all respects) as though made:

Section 5.1     Organization and Good Standing.  Seller is an entity duly organized, validly existing and in good standing under the Laws of the jurisdiction of Seller's organization. Subject to the limitations imposed on Seller as a result of the Filing, Seller has the requisite limited liability company power and authority to own or lease and to operate and use Seller's properties and to carry on its business as presently conducted. Seller is not in default under or in violation of any provision of its organizational documents.

Section 5.2     Authority; Validity; Consents.  Seller has, subject to requisite Bankruptcy Court approval, as applicable, the requisite limited liability company power and authority necessary to enter into and perform Seller's obligations under this Agreement and the other Transaction Documents to which Seller is a party and to consummate the transactions contemplated hereby and thereby. This Agreement has been duly and validly executed and delivered by Seller and each other Transaction Document required to be executed and delivered by Seller at the Closing will be duly and validly executed and delivered by Seller at the Closing. Subject to requisite Bankruptcy Court approval, as applicable, this Agreement and the other Transaction Documents constitute, with respect to Seller, the legal, valid and binding obligations of Seller, enforceable against Seller in accordance with their respective terms, except as such enforceability is limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity. Subject to, and after giving effect to, requisite Bankruptcy Court approval (including, without limitation, the Sale Order), as applicable, and except (a) for entry of the Sale Order and (b) for notices, filings and consents required in connection with the Bankruptcy Case, Seller is not required to give any notice to, make any filing with or obtain any consent from any Person (including any Governmental Authority) in connection with the execution and delivery of this

12

Agreement and the other Transaction Documents or the consummation or performance of any of the transactions contemplated hereby and thereby.

Section 5.3     No Conflicts. The execution, delivery and performance by Seller of this Agreement and the other Transaction Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) conflict with or result in a violation or breach of, or default under, any provision of the organizational documents of Seller; (b) conflict with or result in a violation or breach of any provision of any Law or Governmental Authorization applicable to Seller, its business or the Acquired Assets; (c) conflict with, result in a violation or breach of, constitute a default or an event that, with or without notice or lapse of time or both, would constitute a default under, result in the acceleration of or create in any party the right to accelerate, terminate, modify or cancel any Contract or Governmental Authorization to which Seller is a party or by which Seller or its business is bound or to which any of the Acquired Assets are subject; or (d) result in the creation or imposition of any Encumbrance other than Permitted Encumbrances on the Acquired Assets.

Section 5.4     Material Contracts. Schedule 5.4 lists each Contracts by which any of the Acquired Assets are bound or affected or to which Seller is a party or by which it is bound in connection with the Acquired Assets (such Contracts being "Material Contracts"). Each Material Contract is valid and binding on Seller in accordance with its terms and is in full force and effect. None of Seller or, to Seller's Knowledge, any other party thereto is in breach of or default under (or is alleged to be in breach of or default under), or has provided or received any notice of any intention to terminate, any Material Contract. No event or circumstance has occurred that, with notice or lapse of time or both, would constitute an event of default under any Material Contract or result in a termination thereof or would cause or permit the acceleration or other changes of any right or obligation or the loss of any benefit thereunder. Complete and correct copies of each Material Contract (including all modifications, amendments and supplements thereto and waivers thereunder) have been made available to Buyer. There are no material disputes pending or threatened under any Contract included in the Acquired Assets.

Section 5.5     Title to Acquired Assets. Immediately prior to Closing, Seller will have and, upon delivery to Buyer on the Closing Date of the instruments of transfer contemplated by Section 4.3, and subject to the terms of the Sale Order, Seller will thereby transfer to Buyer, marketable title to or, a valid contractual interest in all of the Acquired Assets free and clear of all Encumbrances, except for Permitted Encumbrances.

Section 5.6     Taxes. There are no Encumbrances for Taxes on any of the Acquired Assets other than Permitted Encumbrances, nor is any taxing authority in the process of imposing any Encumbrance for Taxes on any of the Acquired Assets. All Tax Returns in relation to the Acquired Assets required to be filed by Seller for any period prior to the Closing Date have been, or will be, timely filed. Such Tax Returns are, or will be, true, complete and correct in all respects. All Taxes due and owing by Seller in relation to the Acquired Assets (whether or not shown on any Tax Return) have been, or will be, timely paid. Seller is not a party to any Action by any taxing authority. There are no pending or threatened Actions by any taxing authority.

13

Section 5.7    Legal Proceedings. Except for the Bankruptcy Case [and as set forth on Schedule 5.7] there is no Proceeding or Order pending, outstanding or, to Seller's Knowledge, threatened against Seller that (a) seeks to restrain or prohibit or otherwise challenge or delay the consummation, legality or validity of the transactions contemplated hereby or (b) relates to or affects the Acquired Assets. There are no outstanding Orders or unsatisfied judgments, penalties or awards against, relating to or affecting the Acquired Assets and, to the Knowledge of Seller, no event has occurred or circumstances exist that may give rise to or serve as a basis for any such Proceeding or Order. . Seller has materially complied, and is now materially complying, with all Laws applicable to the Acquired Assets, including the ownership and use thereof.

Section 5.8    Brokers or Finders. Except for Hilco Streambank, Seller has not incurred any obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement, the other Transaction Documents or the transactions contemplated hereby or thereby for which Buyer is or will become liable, and Seller shall indemnify and hold harmless Buyer from any claims with respect to any such fees or commissions.

Section 5.9    Intellectual Property.

(a)    Schedule 5.9(a) lists all issued registered Trademarks included in the Acquired Assets. Except as noted on Schedule 5.9(a), all required filings and fees related to the registered Intellectual Property have been timely filed with and paid to the relevant Governmental Authorities and authorized registrars, and all Intellectual Property registrations are otherwise in good standing. Seller has provided Buyer with true and complete copies of file histories, documents, certificates, office actions, correspondence and other materials related to all such Intellectual Property registrations.

(b)    Schedule 5.9(b) lists all Intellectual Property Agreements. Seller has provided Buyer with true and complete copies of all such Intellectual Property Agreements, including all modifications, amendments and supplements thereto and waivers thereunder. Each listed Intellectual Property Agreement is valid and binding on Seller in accordance with its terms and is in full force and effect. Neither the Seller nor, to Seller's Knowledge, is any other party thereto is in breach of or default under (or is alleged to be in breach of or default under), or has provided or received any notice of breach or default of or any intention to terminate, any such Intellectual Property Agreement. No event or circumstance has occurred that, with notice or lapse of time or both, would constitute an event of default under any listed Intellectual Property Agreement or result in a termination thereof or would cause or permit the acceleration or other changes of any right or obligation or the loss of any benefit thereunder. For purposes of this Agreement, "Intellectual Property Agreements" means all licenses, sublicenses, consent to use agreements, settlements, coexistence agreements, covenants not to sue, permissions and other Contracts (including any right to receive or obligation to pay royalties or any other consideration), whether written or oral, relating to any Intellectual Property included within the Acquired Assets to which Seller is a party, beneficiary or otherwise bound.

14

(c)     Seller is the sole and exclusive legal and beneficial, and with respect to the Intellectual Property registrations included within the Acquired Assets, record, owner of all right, title and interest in and to the Intellectual Property included within the Acquired Assets, in each case, free and clear of Encumbrances other than Permitted Encumbrances. The consummation of the transactions contemplated hereunder will not result in the loss or impairment of or payment of any additional amounts with respect to, nor require the consent of any other Person in respect of, the Buyer's right to own, use or hold for use any such Intellectual Property.

(d)     Seller's rights in the Intellectual Property included within the Acquired Assets are valid, subsisting and enforceable. Seller has taken commercially reasonable steps to maintain such Intellectual Property and to protect and preserve the confidentiality of all trade secrets included in such Intellectual Property.

(e)     The conduct of Seller's business as currently and formerly conducted, and the Intellectual Property included within the Acquired Assets and Intellectual Property licensed under the Intellectual Property Agreements as currently or formerly owned, licensed or used by Seller, have not infringed, misappropriated, diluted or otherwise violated, and have not, do not and will not infringe, dilute, misappropriate or otherwise violate, the Intellectual Property or other rights of any Person. To Seller's Knowledge, no Person has infringed, misappropriated, diluted or otherwise violated, or is currently infringing, misappropriating, diluting or otherwise violating, any Intellectual Property included within the Acquired Assets.

(f)     There are no Claims (including any oppositions, interferences or re-examinations) settled, pending or threatened (including in the form of offers to obtain a license): (i) alleging any infringement, misappropriation, dilution or violation of the Intellectual Property of any Person by Seller in connection with its business; (ii) challenging the validity, enforceability, registrability or ownership of any Intellectual Property included within the Acquired Assets or Seller's rights with respect to any such Intellectual Property; or (iii) by Seller or any other Person alleging any infringement, misappropriation, dilution or violation by any Person of any such Intellectual Property. Seller is not subject to any outstanding or prospective Order (including any motion or petition therefor) that does or would restrict or impair the use of any such Intellectual Property.

(g)     Schedule 5.9(g) identifies and describes each distinct electronic or other database containing (in whole or in part) Personal Data related to the Acquired Assets maintained by or for Seller at any time ("Seller Databases"), the types of Personal Data in each such database, the means by which the Personal Data was collected, and the security policies that have been adopted and maintained with respect to each such database. Except as described in Schedule 5.9(g), no material breach of violation of any such security policy has occurred in the past two (2) years or is occurring or, to the Knowledge of Seller, is threatened, and in the past two (2) years there has not been, nor is there currently any unauthorized or illegal use of or access to any of the data or information in any of the Seller Databases. Except as set forth on Schedule 5.9(g), Seller has complied at all times and in all material respects with all of Seller's privacy policies and with all applicable Laws pertaining to privacy or Personal Data. For purposes of this Agreement, "Personal Data" means a natural person's name, street address,

15

telephone number, email address, photograph, social security number, driver's license number, passport number or customer or account number or any other piece of information that allows the identification of a natural person.

Section 5.10    No Other Representations or Warranties; Full Disclosure; No Survival. Buyer acknowledges that, except for the representations and warranties contained in this Article V, neither Seller nor any other Person on behalf of Seller makes any express or implied representation or warranty with respect to Seller or with respect to any information provided by or on behalf of Seller to Buyer. The representations and warranties of Seller will expire upon the earlier of the Closing Date or the termination of this Agreement.

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller that the statements contained in this Article VI are true and correct as of the date hereof and shall be true and correct as of the Closing Date (other than such representations and warranties that are expressly made as of another date which shall have been true and correct as of such date) as though made:

Section 6.1    Organization and Good Standing.  Buyer is a limited liability company, duly organized, validly existing and in good standing under the laws of the jurisdiction of Buyer's organization. Buyer has the requisite power and authority to own or lease and to operate and use Buyer's properties and to carry on Buyer's business as now conducted.

Section 6.2    Authority; Validity; Consents. Buyer has the requisite power and authority necessary to enter into and perform Buyer's obligations under this Agreement and the other Transaction Documents to which it is a party and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance of this Agreement by Buyer and the consummation by Buyer of the transactions contemplated herein have been duly and validly authorized by all requisite company actions in respect thereof. This Agreement has been duly and validly executed and delivered by Buyer and each other Transaction Document to which Buyer is a party will be duly and validly executed and delivered by Buyer at the Closing. This Agreement and the other Transaction Documents to which Buyer is a party constitute the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with their respective terms, except as such enforceability is limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity. Subject to requisite Bankruptcy Court approval, as applicable. Buyer is not and will not be required to give any notice to or obtain any consent from any Person in connection with the execution and delivery of this Agreement and the other Transaction Documents to which it is a party or the consummation or performance of any of the transactions contemplated hereby or thereby.

Section 6.3    No Conflict. When the consents and other actions described in Section 6.2 have been obtained and taken, the execution and delivery of this Agreement and the other Transaction Documents and the consummation of the transactions provided for herein and

16

therein will not result in the breach of any of the terms and provisions of, or constitute a default under, or conflict with, or cause any acceleration of any obligation of Buyer under (a) any agreement, indenture, or other instrument to which it is bound, (b) the certificate of formation of Buyer, (c) any Order or (d) any Law.

Section 6.4    Availability of Funds; Solvency.  Buyer has and will have at the Closing sufficient cash in immediately available funds to pay the Purchase Price and any other costs, fees and expenses required to be paid by it under this Agreement and the other Transaction Documents. As of the Closing and immediately after consummating the transactions contemplated by this Agreement and the other transactions contemplated by the Transaction Documents, Buyer will not, assuming the accuracy of Seller's representations and warranties under this Agreement, (i) be insolvent (either because Buyer's financial condition is such that the sum of Buyer's debts is greater than the fair value of Buyer's assets or because the present fair value of Buyer's assets will be less than the amount required to pay Buyer's probable Liability on Buyer's debts as they become absolute and matured), (ii) have unreasonably small capital with which to engage in Buyer's business or (iii) have incurred or plan to incur debts beyond Buyer's ability to repay such debts as they become absolute and matured.

Section 6.5    Litigation. There are no Proceedings pending or, to the knowledge of Buyer, threatened, that would affect in any material respect Buyer's ability to perform Buyer's obligations under this Agreement or any other Transaction Documents or to consummate the transactions contemplated hereby or thereby.

Section 6.6    Brokers or Finders. Neither Buyer nor any Person acting on behalf of Buyer has paid or become obligated to pay any fee or commission to any broker, finder, investment banker, agent or intermediary for or on account of the transactions contemplated by this Agreement for which Seller is or will become liable, and Buyer shall hold harmless and indemnify Seller from any claims with respect to any such fees or commissions.

Section 6.7    Condition of Acquired Assets: Representations. Notwithstanding anything contained in this Agreement to the contrary, Buyer acknowledges and agrees that Seller is not making any representations or warranties whatsoever, express or implied, beyond those expressly given by Seller in <u>Article V</u> (subject to the disclosures set forth on the Schedules), and Buyer acknowledges and agrees that, except for the representations and warranties contained therein, the Acquired Assets are being transferred on a "where is" and, as to condition, "as is" basis. Buyer acknowledges that it has conducted to Buyer's satisfaction Buyer's own independent investigation of Seller's business and, in making the determination to proceed with the transactions contemplated by this Agreement, Buyer has relied on the representations and warranties expressly given by Seller in Article V and the results of Buyer's own independent investigation. In connection with Buyer's investigation. Buyer has received or may receive from Seller certain projections, forward-looking statements and other forecasts and certain business plan information. Buyer acknowledges that there are uncertainties inherent in attempting to make such estimates, projections and other forecasts and plans, that Buyer is familiar with such uncertainties, that Buyer is taking full responsibility for making Buyer's own evaluation of the adequacy and accuracy of all estimates, projections and other forecasts and plans so furnished to

17

Buyer (including the reasonableness of the assumptions underlying such estimates, projections, forecasts or plans), and that Buyer shall have no claim against anyone with respect thereto. Accordingly, Buyer acknowledges that Seller makes no representation or warranty with respect to such estimates, projections, forecasts or plans (including the reasonableness of the assumptions underlying such estimates, projections, forecasts or plans).

**ARTICLE VII**
**ACTIONS PRIOR TO THE CLOSING DATE**

Section 7.1    Operations Prior to the Closing Date. Seller covenants and agrees that, except (i) as expressly contemplated by this Agreement, (ii) with the prior written consent of Buyer (which consent, other than with respect to Section 7.1(b)(ii), shall not be unreasonably withheld or delayed), (iii) as required by the Bankruptcy Court or (iv) as otherwise required by Law, after the Effective Date and prior to the Closing Date:

(a)    Seller shall use commercially reasonable efforts, taking into account Seller's status as a debtor-in-possession in the Bankruptcy Case, to maintain and preserve the Acquired Assets in their present condition and, without limiting the generality of the foregoing,

(b)    Seller shall not:

(i)    sell, lease (as lessor), transfer or otherwise dispose of, or mortgage or pledge, or voluntarily impose or suffer to be imposed any Encumbrance (other than Assumed Liabilities and Permitted Encumbrances) on, any Acquired Asset;

(ii)    cancel or compromise any material claim or waive or release any material right, in each case, that is a claim or right related to an Acquired Asset; or enter into any agreement or commitment to take any action prohibited by this Section 7.1.

Section 7.2    Bankruptcy Court Filings and Approval.

(a)    Seller shall use Seller's commercially reasonable efforts to obtain entry of the Sale Order and such other relief from the Bankruptcy Court as may be necessary or appropriate in connection with this Agreement and the consummation of the transactions contemplated by this Agreement. Buyer agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order and, consistent with Section 2.4, a finding by the Bankruptcy Court that  Buyer in acquiring the Acquired Assets Buyer is entitled to a finding that it is a good faith purchaser within the meaning of Section 363(m) of the Bankruptcy Code. As soon as reasonably practicable after the parties execute this Agreement, but in any event no later than five (5) Business Days after the parties execute this Agreement, Seller shall file the Sale Motion with the Bankruptcy Court together with required supporting papers and required notices.

(b)    Seller and Buyer acknowledge that this Agreement and the sale of the Acquired Assets are subject to Bankruptcy Court approval. Seller and Buyer acknowledge that to obtain such approval, Seller must demonstrate that they have taken reasonable steps to obtain the

18

highest or otherwise best offer possible for the Acquired Assets and Buyer hereby agrees to provide all appropriate assurances thereof necessary in order to obtain the foregoing approvals.

(c)     Seller shall give all notices required to be given by applicable Law, to all Persons entitled thereto, of all motions (including the motions seeking entry of the Sale Order), orders, hearings and other proceedings relating to this Agreement and the transactions contemplated hereby and thereby and such additional notice as ordered by the Bankruptcy Court or as Buyer may reasonably request. Seller shall promptly provide Buyer with copies of all communications from the Bankruptcy Court relating to the motions seeking entry of the Sale Order.

(d)     In the event an appeal is taken or a stay pending appeal is requested, from the Sale Order, Seller shall immediately notify Buyer of such appeal or stay request and shall provide to Buyer promptly a copy of the related notice of appeal or order of stay. Seller shall also provide Buyer with written notice of any motion or application filed in connection with any appeal from or stay request in respect of such order. Seller and Buyer shall use each of their respective commercially reasonable efforts to defend such appeal or stay request and obtain an expedited resolution of such appeal.

(e)     From and after the date hereof, Seller shall not take any action that is intended to, or fail to take any action the intent of which failure to act is to, result in the reversal, voiding, modification or staying of the Sale Order.

Section 7.3     Investigation of Seller's Business by Buyer. Between the date hereof and the earlier of the termination of this Agreement and the Closing Date, Seller shall permit Buyer's authorized representatives reasonable access during regular business hours and upon reasonable notice, to the offices, properties, agreements and other documentation and records with respect to the Acquired Assets and the Assumed Liabilities, all to the extent Buyer reasonably requests. Any such investigation shall be conducted in a manner so as not to interfere with the operations of Seller.  Seller shall use its commercially reasonable efforts to cause their respective outside accountants and outside counsel to cooperate with Buyer in its investigation.

Section 7.4     Third Party Consents and Acknowledgements. Between the date hereof and the earlier of the termination of this Agreement and the Closing Date, Seller shall use its commercially reasonable efforts to obtain all third party consents required for the consummation of the transactions contemplated hereby to the extent such consents are not provided for or satisfied by the Sale Order.

Section 7.5     Governmental Approvals. Seller and Buyer shall act diligently and reasonably, and shall cooperate with each other, to do or cause to be done, all things necessary, proper or advisable consistent with applicable confidentiality and legal requirements to cause the conditions precedent to the Closing to be satisfied and to cause the Closing to occur, including to secure any consents and approvals of any Governmental Authority required to be obtained by them, in order to permit the consummation of the transactions contemplated by this Agreement, or to otherwise satisfy the conditions precedent set forth in this Agreement, in each case as

19

necessary to the extent such consents are not provided for or satisfied by the Sale Order; provided, however, that Seller shall not make any agreement or understanding affecting the Acquired Assets as a condition for obtaining any such consents or approvals except with the prior written consent of Buyer.

Section 7.6    Notice of Certain Events. From the date hereof until the Closing, Seller shall promptly notify Buyer in writing of (a) any fact, circumstance, event or action the existence, occurrence or taking of which has had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect; (b) has resulted in, or could reasonably be expected to result in, any representation or warranty made by Seller hereunder not being true and correct; (c) has resulted in, or could reasonably be expected to result in, the failure of any of the conditions precedent set forth in this Agreement to be satisfied; or (d) any notice or other communication from any Person alleging that the consent of a third party is or may be required in connection with the transactions contemplated by this Agreement.

# ARTICLE VIII
## ADDITIONAL AGREEMENTS

Section 8.1    Taxes.

(a)    Any sales, use, property transfer or gains, documentary, stamp, registration, recording or similar Tax (including, for certainty, goods and services tax, harmonized sales tax and land transfer tax) payable in connection with the sale or transfer of the Acquired Assets ("Transfer Taxes") shall be borne by Buyer and, to the extent Seller is required by applicable Law to pay Transfer Taxes, such Transfer Taxes shall be paid by Buyer to Seller at Closing. Seller and Buyer shall use reasonable efforts and cooperate in good faith to exempt the sale and transfer of the Acquired Assets from any such Transfer Taxes. Seller shall prepare and file all necessary Tax Returns or other documents with respect to all such Transfer Taxes; provided, however, that in the event any such Tax Return requires execution by Buyer, Seller shall prepare and deliver to Buyer a copy of such Tax Return at least three (3) Business Days before the due date thereof, and Buyer shall promptly execute such Tax Return and deliver it to Seller, which shall cause it to be filed.

(b)    Buyer and Seller agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Acquired Assets (including access to Documents) as is reasonably necessary for the filing of all Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any taxing authority and the prosecution or defense of any claims, suit or proceeding relating to any Tax; provided, however, that (other than as required pursuant to this Section 8.1(b) neither Buyer nor Seller shall be required to disclose the contents of its income tax returns to any Person. Any expenses incurred in furnishing such information or assistance pursuant to this Section 8.1(b) shall be borne by the Party requesting it,

20

(c)    Notwithstanding any other provisions in this Agreement, Buyer and Seller hereby waive compliance with all "bulk sales," "bulk transfer" and similar laws that may be applicable with respect to the sale and transfer of any or all of the Acquired Assets to Buyer.

Section 8.2    Payments Received. Seller, on the one hand, and Buyer, on the other hand, each agree that, after the Closing, each will hold and will promptly transfer and deliver to the other, from time to time as and when received by them, any cash, checks with appropriate endorsements (using each of their best efforts not to convert such checks into cash) or other property that they may receive on or after the Closing which properly belongs to the other and will account to the other for all such receipts.

Section 8.3    Confidentiality. From and after the Closing, Seller shall, and shall cause its affiliates to, hold, and shall use its reasonable best efforts to cause its or their respective representatives to hold, in confidence any and all information, whether written or oral, concerning the Acquired Assets, except to the extent that Seller can show that such information (a) is generally available to and known by the public through no fault of Seller, any of its affiliates or their respective representatives; or (b) is lawfully acquired by Seller, any of its affiliates or their respective representatives from and after the Closing from sources which are not prohibited from disclosing such information by a legal, contractual or fiduciary obligation. If Seller or any of its affiliates or their respective representatives are compelled to disclose any information by judicial or administrative process or by other requirements of Law, Seller shall promptly notify Buyer in writing and shall disclose only that portion of such information which Seller is advised by its counsel in writing is legally required to be disclosed, provided that Seller shall use reasonable best efforts to obtain an appropriate protective order or other reasonable assurance that confidential treatment will be accorded such information.

## ARTICLE IX
## CONDITIONS PRECEDENT TO THE OBLIGATION OF BUYER TO CLOSE

Buyer's obligation to consummate the transactions contemplated by this Agreement is subject to the satisfaction or waiver, at or prior to the Closing, of each of the following conditions:

Section 9.1    Accuracy of Representations, The representations and warranties of Seller contained in Article V shall be true and correct as of the date hereof and in all material respects as of the Closing Date as though made on and as of the Closing Date (except that (i) those representations and warranties which address matters only as of a particular date need only be true and correct as of such date and (ii) any representations and warranties qualified by materiality shall be true and correct in all respects). Buyer shall have received a certificate of Seller, signed by a duly authorized officer of Seller, to that effect.

Section 9.2    Seller's Performance. Seller shall have performed and complied with in all material respects the covenants and agreements that Seller is required to perform or comply with pursuant to this Agreement at or prior to the Closing, and Buyer shall have received a certificate of Seller to such effect signed by a duly authorized officer of Seller.

21

Section 9.3    No Order. No Governmental Authority shall have enacted, issued, promulgated or entered any Order which is in effect and has the effect of making illegal or otherwise prohibiting the consummation of the transactions contemplated by this Agreement (a "Closing Legal Impediment"); provided, however, that prior to asserting this condition Buyer shall have taken all actions required by Section 7.2 to prevent the occurrence or entry of any such Closing Legal Impediment and to remove or appeal as promptly as possible any such Closing Legal Impediment.

Section 9.4    Governmental Authorizations. Any applicable waiting period under any applicable material antitrust or competition Law shall have expired or been terminated and any other material approval under any applicable antitrust or competition Law shall have been received.

Section 9.5    Seller's Deliveries. Each of the deliveries required to be made to Buyer pursuant to Section 4.3 shall have been so delivered.

Section 9.6    Sale Order. The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall not be subject to a stay pending appeal.

Section 9.7    Other Conditions. No Proceeding shall have been commenced against Buyer or Seller that would prevent the Closing. All approvals, consents and waivers necessary to consummate the transactions contemplated by this Agreement shall have been received.

## ARTICLE X
## CONDITIONS PRECEDENT TO THE OBLIGATION OF SELLER TO CLOSE

Seller's obligation to consummate the transactions contemplated by this Agreement is subject to the satisfaction or waiver, at or prior to the Closing, of each of the following conditions:

Section 10.1    Accuracy of Representations. The representations and warranties of Buyer contained in <u>Article VI</u> shall be true and correct as of the date hereof and in all material respects as of the Closing Date as though made on and as of the Closing Date (except that (i) those representations and warranties which address matters only as of a particular date need only be true and correct as of such date and (ii) any representations and warranties qualified by materiality shall be true and correct in all respects). Seller shall have received a certificate of Buyer, signed by a duly authorized officer of Buyer, to that effect.

Section 10.2    Buyer's Performance. Buyer shall have performed and complied with in all material respects the covenants and agreements that Buyer is required to perform or comply with pursuant to this Agreement at or prior to the Closing, and Seller shall have received a certificate of Buyer to such effect signed by a duly authorized officer thereof.

Section 10.3    No Order. No Closing Legal Impediment shall be in effect, provided. however, that prior to asserting this condition Seller shall have taken all actions required by

22

Section 7.2 to prevent the occurrence or entry of any such Closing Legal Impediment and to remove or appeal as promptly as possible any such Closing Legal Impediment.

Section 10.4   Governmental Authorizations. Any applicable waiting period under any material applicable antitrust or competition Law shall have expired or been terminated and any other material approval under any applicable antitrust or competition Law shall have been received.

Section 10.5   Buyer's Deliveries. Each of the deliveries required to be made to Seller pursuant to Section 4.2 shall have been so delivered.

Section 10.6   Sale Order in Effect. The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall not be subject to a stay pending appeal.

## ARTICLE XI
## TERMINATION

Section 11.1   Termination Events. Anything contained in this Agreement to the contrary notwithstanding (other than as provided in the last sentence of this Section 11.1 this Agreement may be terminated at any time prior to the Closing Date:

(a)   by mutual written consent of Seller and Buyer; or

(b)   by either Seller or Buyer:

(i)   if the Bankruptcy Court does not approve this Agreement for any reason or if a Governmental Authority issues a final, non-appealable ruling or Order permanently prohibiting the transactions contemplated hereby, provided. however, that the right to terminate this Agreement pursuant to this Section 11.1(b)(i) shall not be available to any Party whose breach of any of its representations, warranties, covenants or agreements contained herein results in such failure to approve, such ruling or Order;

(ii)   if the Closing shall not have occurred by the close of business on November 6, 2017 (the "Outside Date"): provided, however, that the right to terminate this Agreement pursuant to this Section 1l.l(b)(ii) shall not be available to any Party whose breach of any of such Party's representations, warranties, covenants, or agreements contained herein results in the failure of the Closing to be consummated by such time; provided, further, that if as of the Outside Date, all of the conditions precedent to the Closing other than the conditions set forth in Sections 9.4 and 10.4 (and other than those conditions that by their terms are to be satisfied at the Closing or on the Closing Date) shall have been satisfied as of the Outside Date, then Seller shall be entitled to extend the Outside Date until November 16, 2017, upon written notice to the Buyer, in which case the Outside Date shall be deemed for all purposes to be November 16,2017;

(iii)   if (A) the Sale Hearing is not held on or before October 26, 2017; provided, however, if the Sale Hearing is delayed due to the Bankruptcy Court's unavailability, the next Business Day on which the Bankruptcy Court is available, or (B) the Bankruptcy Court

23

has not entered the Sale Order on or before October 26, 2017; provided, however, if approval of the Sale Order is delayed due to the Bankruptcy Court's unavailability, the next Business Day on which the Bankruptcy Court is available;

(iv)    if the Sale Order is vacated; or

(v)    if Seller enters into a definitive agreement with respect to an Alternative Transaction because Buyer is not the Successful Bidder at the Auction; provided, however, that if Buyer is the Next Highest Bidder and Seller notifies Buyer of same prior to Seller's entry into a definitive agreement with respect to an Alternative Transaction, then Buyer may not terminate this Agreement or withdraw its irrevocable offer unless and until such Alternative Transaction has closed; or

(c)    Seller (A) files any stand-alone plan of reorganization or liquidation that does not contemplate, the implementation or consummation of, the transactions provided for in this Agreement or (B) consummates an Alternative Transaction; or by Buyer:

(i)    in the event of any breach by Seller of any of Seller's agreements, covenants, representations or warranties contained herein that would result in the failure of a condition set forth in Article IX to be satisfied, and the failure of Seller to cure such breach by the earlier of (A) the Outside Date and (B) the date that is 15 days after receipt of the Buyer Termination Notice; provided, however, that (1) Buyer is not in breach of any of Buyer's representations, warranties, covenants or agreements contained herein in a manner that would result in the failure of a condition set forth in Article X to be satisfied, (2) Buyer notifies Seller in writing (the "Buyer Termination Notice") of Buyer's intention to exercise Buyer's rights under this Section ll.1(c)(i) as a result of the breach, and (3) Buyer specifies in the Buyer Termination Notice the representation, warranty, covenant or agreement contained herein of which Seller is allegedly in breach;

(ii)    if the Bankruptcy Case is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code and neither such dismissal nor conversion expressly contemplates the transactions provided for in this Agreement; or

(iii)    if any conditions to the obligations of Buyer set forth in Article IX shall have become incapable of fulfillment other than as a result of a breach by Buyer of any covenant or agreement contained in this Agreement; or

(d)    by Seller:

(i)    except as provided in Section 11.1(d)(iii), in the event of any breach by Buyer of any of Buyer's agreements, covenants, representations or warranties contained herein that would result in the failure of a condition set forth in Article X to be satisfied, and the failure of Buyer to cure such breach by the earlier of (A) the Outside Date and (B) the date that is 15 days after receipt of the Seller Termination Notice; provided, however, that Seller (1) is not itself in material breach of any of Seller's representations, warranties, covenants or agreements contained herein, (2) notify Buyer in writing (the "Seller Termination

24

Notice") of Seller's intention to exercise Seller's rights under this Section 11.1(d)(i) as a result of the breach, and (3) specify in the Seller Termination Notice the representation, warranty, covenant or agreement contained herein of which Buyer is allegedly in breach;

(ii)    if Seller consummates a sale, transfer or other disposition of any portion of the Acquired Assets in a transaction or series of transactions with one or more Persons other than Buyer; or

(iii)    if the Sale Order with respect to the transactions contemplated by this Agreement has been entered and is not subject to any stay on enforcement and (A) Seller has provided Buyer with written notice that Seller is prepared to consummate the transactions contemplated by this Agreement, (B) the conditions to Closing in Article IX have been satisfied (or waived by Buyer), other than those conditions that by their nature can only be satisfied at Closing, and (C) the Closing Date does not occur within five (5) Business Days of Seller providing Buyer with such notice.

[For the avoidance of doubt, the Parties acknowledge and agree, that in the event that Seller determines, in Seller's reasonable discretion, that the last overbid submitted by Buyer is better than all other Qualified Bids as such Qualified Bids may be amended by an overbid submitted at the Auction, then within two Business Days following the conclusion of the Auction, Seller and Buyer shall enter into an amendment to this Agreement to reflect Buyer's last overbid; it being acknowledged and agreed that this Agreement shall not be deemed to have terminated by virtue of Buyer's having submitted the winning bid at the Auction.]

Section 11.2    Effect of Termination. If this Agreement is terminated pursuant to Section 1l.l(d)(i) or 11.1(d)(iii), the Minimum Deposit shall be retained by Seller, as Seller's sole and exclusive remedy therefor, for Seller's own account as damages specifically. If this Agreement is terminated pursuant to any provision of Section 11.1 other than either Section 1l.l(d)(i) or Section 1l.1(d)(iii), Seller shall promptly (but in any event within two Business Days of such termination) instruct the Escrow Agent to return the Minimum Deposit to Buyer by wire transfer of immediately available funds.

Section 11.3    Break-Up Fee. In consideration for Buyer having expended considerable time and expense in connection with this Agreement, the negotiations hereof, and due diligence, Seller shall pay Buyer a break-up fee of $5,000 (the "Break-Up Fee") on the first Business Day following the consummation of a transaction relating to the sale of the Acquired Assets to another bidder. The Break-Up Fee payable under this Section shall be paid from the proceeds of sale upon consummation of such a transaction with such a bidder. Return of the Minimum Deposit and the payment of the Break-Up Fee shall be Buyer's sole and exclusive monetary remedy upon the occurrence of the applicable events set forth in this Section, but nothing in this Section shall be deemed to prohibit Buyer from taking any position under applicable law with respect to the approval of the sale to a competing bidder.

## ARTICLE XII
## GENERAL PROVISIONS

25

3032399.1

Section 12.1   Notices.  Any notice, consent or other communication required or permitted under this Agreement shall be in writing and shall be delivered (a) in person, (b) by a nationally recognized courier for overnight delivery service, or (c) by email or other electronic means, confirmed by telephone or return email (including an automated return receipt), to the persons indicated below. A notice or communication shall be deemed to have been effectively given (i) if in person, upon personal delivery to the Party to whom the notice is directed, (ii) if by nationally recognized courier, one Business Day after delivery to such courier, and (iii) if by email or other electronic means, when sent and confirmed by telephone or return email. Rejection or other refusal to accept or inability to deliver because of changed address of which no notice has been received shall also constitute receipt. Any such notice, election, demand, request or response shall be addressed as follows:

       (a)   If to Seller, then to:

           Vanity Shop of Grand Forks, Inc.
           3120 25th Street So., Suite 386Z
           Fargo, ND 58103
           Attention: James Bennett

           with a copy (which shall not constitute notice) to:

           Vogel Law Firm
           218 N.P. Avenue
           Fargo, ND  58107-1389
           Attention:  Jon Brakke
           Phone:  (701) 237-6983
           Facsimile:  (701) 476-7676
           Email:  jbrakke@vogellaw.com

           If to Buyer, then to:

           Media Options S.A.
           Avenida Central, San Felipe_____
           Panama City, Panama         Phone:  786-231-5178
Email:  andrew@mediaoptions.com
           Attention: Andrew Rosener

           with a copy (which shall not constitute notice) to:

           _____
           _____

Section 12.2   Amendment; Waiver. No amendment, modification or discharge of this Agreement, and no waiver hereunder, shall be valid or binding unless set forth in writing and duly executed by the Party against whom enforcement of the amendment, modification,

26

discharge or waiver is sought and such amendment, modification, discharge or waiver is delivered substantially contemporaneously to each other Party. Any such waiver shall constitute a waiver only with respect to the specific matter described in such writing and shall in no way impair the rights of the Party granting such waiver in any other respect or at any other time. Neither the waiver by any of the Parties of a breach of or a default under any of the provisions of this Agreement, nor the failure by any of the Parties, on one or more occasions, to enforce any of the provisions of this Agreement or to exercise any right or privilege hereunder shall be construed as a waiver of any other breach or default of a similar nature, or as a waiver of any of such provisions, rights or privileges hereunder. No course of dealing between or among the Parties shall be deemed effective to modify, amend or discharge any part of this Agreement or any rights to payment of any Party under or by reason of this Agreement.

Section 12.3   Entire Agreement. This Agreement (including the Schedules and the Exhibits) and the other Transaction Documents contain all of the terms, conditions and representations and warranties agreed to by the Parties relating to the subject matter of this Agreement and supersede all prior and contemporaneous agreements, understandings, negotiations, correspondence, undertakings and communications of the Parties or their representatives, oral or written, respecting such subject matter. The representations, warranties, covenants and agreements contained in this Agreement (including the Schedules and the Exhibits) and the other Transaction Documents are intended, among other things, to allocate the economic cost and the risks inherent in the transactions contemplated hereby and thereby, including risks associated with matters as to which the party making such representations and warranties has no knowledge or only incomplete knowledge, and such representations and warranties may be qualified by disclosures contained in the Schedules. Consequently, Persons other than the Parties may not rely upon the representations and warranties in this Agreement as characterizations of actual facts or circumstances as of the date of this Agreement or as of any other date.

Section 12.4   No Presumption as to Drafting. Each of the parties acknowledges that it has been represented by legal counsel in connection with this Agreement and the other Transaction Documents and the transactions contemplated hereby and thereby. Accordingly, any rule of law or any legal decision that would require interpretation of any claimed ambiguities in this Agreement or the Transaction Documents against the drafting party has no application and is expressly waived.

Section 12.5   Assignment. This Agreement, and the rights, interests and obligations hereunder, shall not be assigned by any Party by operation of law or otherwise without the express written consent of the other Parties (which consent maybe granted or withheld in the sole discretion of such other Party); provided, however, that Buyer shall be permitted, upon prior notice to Seller, to assign all or part of Buyer's rights or obligations hereunder to an Affiliate, but no such assignment shall relieve Buyer of Buyer's obligations under this Agreement.

Section 12.6   Severability. The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof. If any provision of this Agreement, or the

27

application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability.

Section 12.7    Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver.

(a)      Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement and all claims or causes of action (whether in contract, tort or otherwise) that may be based upon, arise out of or relate to this Agreement or the negotiation, execution or performance of this Agreement (including any claim or cause of action based upon, arising out of or related to any representation or warranty made in or in connection with this Agreement or as an inducement to enter into this Agreement) shall be governed by, and construed in accordance with, the laws of the State of North Dakota applicable to Contracts made and to be performed entirely in such state without regard to principles of conflicts or choice of laws or any other law that would make the laws of any other jurisdiction other than the State of North Dakota applicable hereto.

(b)      Without limitation of any Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby and (ii) any and all claims relating to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Proceeding; provided, however, that, if the Bankruptcy Case is closed, all Proceedings arising out of or relating to this Agreement shall be heard and determined in a North Dakota state court or a federal court sitting in the State of Delaware, and the Parties hereby (a) irrevocably and unconditionally submit to the exclusive jurisdiction of the District Court for the County of Cass, State of North Dakota and any state appellate court therefrom within the State of North Dakota (or in the event (but only in the event) that such court does not have subject matter jurisdiction over such Proceeding in the United States District Court for the District of North Dakota) with respect to all Proceedings arising out of or relating to this Agreement and the transaction contemplated hereby (whether based on contract, tort or other theory); (b) agree that all claims with respect to any such Proceeding shall be heard and determined in such courts and agrees not to commence any Proceeding relating to this Agreement or the transactions contemplated hereby (whether based on contract, tort or other theory) except in such courts; (c) irrevocably and unconditionally waive any objection to the laying of venue of any Proceeding arising out of this Agreement or the transactions contemplated hereby and irrevocably and unconditionally waives the defense of an inconvenient forum; and (d) agree that a final judgment in any such Proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law. The Parties agree that any violation of this Section 12.7(b) shall constitute a material breach of this Agreement.

28

(c)    EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY) EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTY HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 12.7.

Section 12.8    Counterparts. This Agreement may be executed in any number of counterparts (including via facsimile or other electronic transmission in portable document format (pdf)) with the same effect as if the signatures to each counterpart were upon a single instrument, and all such counterparts together shall be deemed an original of this Agreement. This Agreement shall become effective when, and only when, each Party shall have received a counterpart hereof signed by the other Party. Delivery of an executed counterpart hereof by means of facsimile or electronic transmission in portable document format (pdf) shall have the same effect as delivery of a physically executed counterpart in person.

Section 12.9    Parties in Interest: No Third Party Beneficiaries. Nothing in this Agreement shall confer any rights, benefits, remedies, obligations, liabilities or claims hereunder upon any Person not a Party or a permitted assignee of a Party.

Section 12.10  Non-Recourse. All claims, obligations, liabilities or causes of action (whether in contract or in tort, in law or in equity or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, be connected with or relate in any manner to this Agreement, the negotiation, execution or performance of this Agreement (including any representation or warranty made in connection with or as an inducement to this Agreement) or the transactions contemplated hereby may be made only against (and are those solely of) the Persons that are expressly identified as Parties to this Agreement. No other Person, including any of their Affiliates, directors, officers, employees, incorporators, members, partners, managers, stockholders, agents, attorneys, or representatives of, or any financial advisors or lenders to, any of the foregoing shall have any liabilities (whether in contract or in tort, in law or in equity, or granted by statute) for any claims, causes of action, obligations or liabilities arising under, out of, in connection with, or related in any manner to, this Agreement or based on, in respect of, or by reason of, this Agreement or its negotiation, execution, performance or breach.

Section 12.11  Schedules; Materiality. The inclusion of any matter in any Schedule shall be deemed to be an inclusion for all purposes of this Agreement, to the extent that such disclosure is sufficient to identify the Section to which such disclosure is responsive, but inclusion therein shall not be deemed to constitute an admission, or otherwise imply, that any such matter is material or creates a measure for materiality for purposes of this Agreement. The

29

disclosure of any particular fact or item in any Schedule shall not be deemed an admission as to whether the fact or item is "material" or would constitute a "Material Adverse Effect."

Section 12.12 Specific Performance.    The Parties acknowledge and agree that (a) irreparable injury, for which monetary damages, even if available, would not be an adequate remedy, will occur in the event that any of the provisions of this Agreement are not performed in accordance with the specific terms hereof or are otherwise breached, and (b) the non-breaching Party or Parties shall therefore be entitled, in addition to any other remedies that may be available, to obtain (without the posting of any bond) specific performance of the terms of this Agreement, if any Proceeding is brought by the non-breaching Party or Parties to enforce this Agreement, the Party in breach shall waive the defense that there is an adequate remedy at law.

Section 12.13 Survival. All covenants and agreements contained herein that by their terms are to be performed in whole or in part, or which prohibit actions, subsequent to the Closing shall survive the Closing in accordance with their terms. All other covenants and agreements contained herein, and all representations and warranties contained herein or in any certificated deliveries hereunder, shall not survive the Closing, and shall thereupon terminate.

*Signature Page Follows*

30

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed and delivered by their duly authorized representatives, all as of the Effective Date.

**MEDIA OPTIONS S.A.**

By: _____

Name: Andrew Rosener

Title: Chief Executive Officer

[SIGNATURE PAGE TO INTELLECTUAL PROPERTY ASSET PURCHASE AGREEMENT]

3032399.1

VANITY SHOP OF GRAND FORKS, INC.

By: _____

Name: _James R. Bennett_

Title: _President / Chairman_

[SIGNATURE PAGE TO INTELLECTUAL PROPERTY ASSET PURCHASE AGREEMENT]

3032399.1

## EXHIBIT A

### Escrow Agreement

This Escrow Agreement (the "Escrow Agreement"), is made and entered into this 27th day of September, 2017, by and among Vanity Shop of Grand Forks, Inc. (the "**Seller**" and "**Escrow Agent**") and Media Options S.A. (the "**Buyer**").

### Recitals

WHEREAS, Seller and Buyer are parties to a certain Asset Purchase Agreement ("**Purchase Agreement**"), dated of even herewith, and to which this Escrow Agreement is attached as Exhibit A; capitalized terms used, but not separately defined herein, shall have the meanings ascribed in the Purchase Agreement;

WHEREAS, Buyer desires to purchase certain Intellectual Property (as defined in the Purchase Agreement) owned by Seller;

WHEREAS, pursuant to the terms of the Purchase Agreement, Buyer is required to deliver a Minimum Deposit (as further defined in the Purchase Agreement) as payment towards the purchase of the Intellectual Property; and

WHEREAS, Buyer and Seller desire to hold the Minimum Deposit in escrow which shall be disbursed according to this Escrow Agreement and the Purchase Agreement.

### Agreement

NOW THEREFORE, in consideration of the covenants and agreements herein set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, agree as follows:

1.      The above recitals are true and correct and are incorporated herein by this reference.

2.      The Buyer has provided the Minimum Deposit to the Seller in good funds. Seller has deposited the funds into the Seller's operating account.

3.      The Seller will hold the Minimum Deposit in its operating account subject to Sections 3.2, 3.3, 11.2 and 11.3 of the Purchase Agreement. This Escrow Agreement shall remain in effect unless and until it is terminated as provided in Article XI of the Purchase Agreement.

4.      This Escrow Agreement shall be governed by and construed in accordance with the laws of the State of North Dakota.

5.      This Escrow Agreement may be executed in counterparts by facsimile or original, each of which when taken together shall constitute originals.

IN WITNESS WHEREOF, the parties have caused this Escrow Agreement to be executed and delivered by their duly authorized representatives.

**SELLER:**                                          **BUYER:**

**Vanity Shop of Grand Forks, Inc.**                 **Media Options S.A.**

By: _James R. Bennett_                               By: _Andrew Rosener_

Its: _President / Chairman_                           Its: _CEO_

Escrow Agent, by signing below, acknowledges receipt of the Minimum Deposit.

**ESCROW AGENT:**

**Vanity Shop of Grand Forks, Inc.**

By: _James R. Bennett_

Its: _President / Chairman_

3032399.1

**<u>EXHIBIT B</u>**

**Form of Sale Order**

**[Attached to Sale Motion]**

## **EXHIBIT C**

**(Maurices APA)**

INTELLECTUAL PROPERTY ASSET PURCHASE AGREEMENT

THIS INTELLECTUAL PROPERTY ASSET PURCHASE AGREEMENT (this "**Agreement**"") is made as of _____, 2017 (the "**Effective Date**") by and between Maurices Incorporated ("**Buyer**"), and Vanity Shop of Grand Forks, Inc. ("**Seller**"). Capitalized terms used herein and not otherwise defined herein have the meaning set forth in Article I.

## RECITALS

WHEREAS, Seller was engaged in the business of operating clothing retail stores and an online retail business;

WHEREAS, on March 1, 2017, Seller filed a voluntary petition for relief (the "**Filing**") commencing a case under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of North Dakota (the "**Bankruptcy Court**"):

WHEREAS, Buyer has delivered to Seller an amount in cash (such amount, as it may be adjusted pursuant hereto, the "**Minimum Deposit**") in immediately available funds pursuant to the terms of an escrow agreement, attached hereto as Exhibit A (the "**Escrow Agreement**"), by and between the Buyer and Seller;

WHEREAS, Seller believes, following consultation with Seller's retained consultants, and consideration of available alternatives, that, in light of the current circumstances, a sale of certain of Seller's intellectual property assets as provided herein is necessary to preserve and maximize value, and is in the best interest of Seller, Seller's creditors, and stakeholders;

WHEREAS, Seller desires to sell to Buyer all of the Acquired Assets (defined below) and Buyer desires to purchase from Seller all of the Acquired Assets, in each case upon the terms and conditions hereinafter set forth;

WHEREAS, the execution and delivery of this Agreement and Seller's ability to consummate the transactions set forth in this Agreement are subject to, among other things, the entry of the Sale Order under, inter alia, Sections 363 and 365 of the Bankruptcy Code; and

WHEREAS, the Parties desire to consummate the proposed transaction as promptly as practicable after the Bankruptcy Court enters the Sale Order.

NOW, THEREFORE, in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged and intending to be legally bound hereby, the Parties agree as follows:

1

# ARTICLE I
## DEFINITIONS

Section 1.1    Definitions. For purposes of this Agreement, the following terms have the meaning specified or referenced below.

"Acquired Assets" shall have the meaning set forth in Section 2.1.

"Affiliate" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, such other Person. For purposes of this definition, "control" when used with respect to any Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, and the terms " controlling" and " controlled" have correlative meanings.

"Agreement" shall have the meaning set forth in the Preamble.

"Allocation Schedule" shall have the meaning set forth in Section 3.5(a).

"Alternative Transaction" means a transaction or series of related transactions (whether by asset sale, equity purchase, merger, plan of reorganization or liquidation, or otherwise) pursuant to which Seller enters into an agreement to sell all of the Acquired Assets or any group of assets that includes all or any material portion of the Acquired Assets to a Third Party.

"Available Assets" shall mean the assets in the schedule annexed to the Sale Motion .

"Auction" shall mean the auction of the Acquired Assets.

"Avoidance Actions" means any and all claims for relief of Seller under chapter 5 of the Bankruptcy Code, or state fraudulent conveyance, fraudulent transfer or other similar state laws.

"Bankruptcy Case" means, collectively, the bankruptcy cases commenced by Seller under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court in the Filing.

"Bankruptcy Code" means Title 11 of the United States Code, Section 101 et seq.

"Bankruptcy Court" shall have the meaning set forth in the Recitals.

"Business Day" means any day of the year, other than a Saturday or Sunday, on which national banking institutions in New York, New York are open to the public for conducting business and are not required or authorized by Law to close.

"Buyer" shall have the meaning set forth in the Preamble.

"Buyer Termination Notice" shall have the meaning set forth in Section 11.1(c)(i).

2

3032433.4

"Cash Consideration" means $75,000.

"Claims" means all claims, causes of action, rights of recovery (including rights of indemnity, warranty rights, rights of contribution, rights to refunds and rights to reimbursement) and rights of set-off, in each case, of whatever kind or description against any Person.

"Closing" shall have the meaning set forth in Section 4.1.

"Closing Date" shall have the meaning set forth in Section 4.1.

"Closing Legal Impediment" shall have the meaning set forth in Section 9.3.

"Code" means the Internal Revenue Code of 1986, as amended.

"Consumer Ombudsman" shall have the meaning set forth in the Bankruptcy Code.

"Contract" means any contract, agreement, undertaking, license, sublicense, sales order, purchase order or other commitment, whether written or oral (including commitments to enter into any of such), that is binding on any Person or any part of its property under applicable Law.

"Copyrights" means: (a) works of authorship whether or not copyrightable; and (b) any other copyrights, copyrightable subject matter and works, whether registered or unregistered, together with all rights to register and obtain renewals and extensions of copyright registrations and all common law rights, and any applications and registrations, as well as all moral rights, therefor.

"Customer Data" means: customer names, physical mailing addresses, email addresses and home and/or mobile telephone numbers, and transaction data that relate to the Intellectual Property that are part of the Acquired Assets, to the extent located within the business records of Seller.

"Documents" means all books, records, files, invoices, inventory records, product specifications, customer lists and other customer-related information, cost and pricing information, supplier lists, business plans, personnel records, catalogs, customer literature, quality control records and manuals and credit records of customers relating to any Intellectual Property, including all data and other information stored on hard drives (including those located on remote servers, whether operated by Seller or by Third Party providers), discs, tapes or other media.

"Domain Names" means the domain names VANITYSHOPS.COM and EVANITY.COM and related uniform resource locators.

"Effective Date" shall have the meaning set forth in the Preamble.

"Encumbrance" means any charge, lien, claim, mortgage, lease, sublease, hypothecation, deed of trust, pledge, security interest, option, right of use or possession, right of first offer or

3

first refusal, easement, servitude, restrictive covenant, encroachment, encumbrance, or other similar restriction of any kind.

"Escrow Agreement" shall have the meaning set forth in the Recitals.

"Excluded Assets" shall have the meaning set forth in Section 2.2.

"Filing" shall have the meaning set forth in the Recitals.

"Governmental Authority" means any United States federal, state, municipal or local or any foreign government, governmental agency or authority, or regulatory or administrative authority, or any court, tribunal or judicial body having jurisdiction, including the Bankruptcy Court.

"Governmental Authorization" means any approval, consent, license, permit, waiver or other authorization issued granted or otherwise made available by or under the authority of any Governmental Authority.

"Intellectual Property" means the Seller's trademarks – Vanity (USPTO registration numbers 4973696, 4973695, 3717668, 3717553, 3701029, 3717667, 3691530, 3691596, 3691531, 3691529, 3691515, 3691496, 1891144, 1800825, 1780669) and the Domain Names and all rights and remedies related to any of the foregoing, including the right to sue for and recover damages, profits and any other remedy in connection therewith, for past, present or future infringement, misappropriation or other violation related to any of the foregoing.

"Knowledge" means, with respect to any matter in question, in the case of Seller, the actual knowledge (or the knowledge that would be obtained after due and reasonable inquiry) of James Bennett, with respect to such matter.

"Law" means any foreign or domestic law, statute, code, ordinance, rule, regulation, order, judgment, writ, stipulation, award, injunction or decree by any Governmental Authority.

"Liability" means any debt, loss, claim, damage, demand, fine, judgment, penalty, liability or obligation (whether direct or indirect, known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, matured or unmatured, determined or determinable, liquidated or unliquidated, or due or to become due and whether in contract, tort, strict liability, successor liability or otherwise) and including all costs and expenses relating thereto (including fees and expenses of legal counsel, experts, engineers and consultants and costs of investigations).

"Material Adverse Effect" means any effect, change, condition, circumstance, development or event that, individually or in the aggregate with all other effects, changes, conditions, circumstances, developments and events has had, or would reasonably be expected to have, a material adverse effect on (a) the Intellectual Property of Seller or (b) the ability of Seller to consummate the transactions contemplated hereby on a timely bases, taken as a whole, excluding any effect, change, condition, circumstance, development or event that results from or

4

arises out of: (i) geopolitical conditions or any outbreak or escalation of hostilities or acts of terrorism or war or any effect, change or event that is otherwise generally applicable to the industries and markets in which Seller operate; (ii) changes in Laws or binding accounting regulations or principles; (iii) the Bankruptcy Case, including, without limitation, the Auction and any announced liquidation of Seller or any of Seller's respective assets; or (iv) any action expressly contemplated by this Agreement or taken at the written request of Buyer, except pursuant to Sections 5.3 or 7.2; provided, however, that any effect, change, condition, circumstances, development or event referred to in clauses (i) through (iv) immediately above shall be taken into account in determining whether a Material Adverse Effect has occurred or would reasonable be expected to occur to the extent that such effect, change, condition, circumstances, development or event has a disproportionate effect on the Acquired Assets.

"Minimum Deposit" shall have the meaning set forth in the Recitals.

"Next Highest Bidder" means the Person submitting a bid at the Auction that is the highest bid immediately before submission of the bid submitted by the Successful Bidder.

"Order" means any award, writ, injunction, judgment, order or decree entered, issued, made or rendered by any Governmental Authority.

"Outside Date" shall have the meaning set forth in Section 11.1(b)(ii).

"Overbid" shall have the meaning set forth in the Sale Procedures and shall be in increments of not less than $15,000.

"Party" or "Parties" means, individually or collectively, Buyer and Seller.

"Patents" means (a) any patent (including certificates of invention and other patent equivalents), (b) any patent applications, (c) any provisional, continuation, continuation-in-part and divisional patent applications based on any of the foregoing, and (d) any patents issuing from any of the items reference in the foregoing clauses (a)-(c), as well as any continuations, continuations-in-part, divisions, extensions, reexaminations, reissues, renewals, patent disclosures, technology, inventions (whether or not patentable or reduced to practice) or improvements thereto.

"Person" means any individual, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, estate, trust, association, organization or other entity or Governmental Authority.

"Proceeding" means any action, arbitration, audit, hearing, investigation, litigation, or suit (whether civil criminal, administrative or investigative) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Authority.

"Purchase Price" has the meaning set forth in Section 3.1.

"Qualified Bid" shall have the meaning set forth in the Sale Procedures.

5

3032433.4

"Representative" means, with respect to a particular Person, any director, officer, employee, agent, consultant, advisor or other representative of such Person, including legal counsel, accountants and financial advisors.

"Sale Hearing" means the hearing conducted by the Bankruptcy Court to approve the transactions contemplated by this Agreement.

"Sale Motion" shall mean the motion filed by the Seller seeking approval of the sale of the Available Assets.

"Sale Order" means an Order of the Bankruptcy Court approving this Agreement and the transactions contemplated hereby, which Order shall be substantially in the form attached hereto as Exhibit B with such changes as are not adverse to Buyer or as the Parties may mutually agree.

"Sale Procedures" shall mean those sale procedures for the Auction as set forth in the Sale Motion.

"Seller" shall have the meaning set forth in the Preamble.

"Seller Termination Notice" shall have the meaning set forth in Section ll.1(d)(i).

"Subsidiary" means any entity with respect to which a specified Person (or a Subsidiary thereof) has the power, through the ownership of securities or otherwise, to elect a majority of the directors or similar managing body.

"Successful Bidder" means the Person submitting the bid determined to be the highest or best offer at the Auction.

"Tax" or "Taxes" means any federal, state, provincial, local, municipal, foreign or other income, alternative, minimum, add-on minimum, accumulated earnings, personal holding company, franchise, capital stock, net worth, capital, profits, intangibles, windfall profits, gross receipts, value added, sales, use, goods and services, excise, customs duties, transfer, conveyance, mortgage, registration, stamp, documentary, recording, premium, severance, environmental (including taxes under Section 59A of the Code),natural resources, real property, personal property, ad valorem, intangibles, rent, occupancy, license, occupational, employment, unemployment insurance, social security, disability, workers' compensation, payroll, health care, withholding, estimated or other similar tax, duty, levy or other governmental charge or assessment or deficiency thereof (including all interest and penalties thereon and additions thereto), in each case imposed by any Governmental Authority.

"Tax Return" means any return, declaration, report, claim for refund, information return or other document (including any related or supporting estimates, elections, schedules, statements, or information) filed with or required to be filed with any Governmental Authority in connection with the determination, assessment or collection of any Tax or the administration of any laws, regulations or administrative requirements relating to any Tax.

6

"Third Party" means a Person who or which is neither a Party nor an Affiliate of a Party.

"Trademarks" means all trade names, trade dress, business names, logos, slogans, designs, trademarks and service marks (common law or otherwise), trademark and service mark registrations and applications therefor, and all other indicia of source of goods and services, designs and logotypes relating to the above, in any and all forms, whether registered or unregistered, and registrations and pending applications to register the foregoing (including intent to use applications), as well as all goodwill appurtenant to any or all of the foregoing.

"Transaction Documents" means this Agreement, the Escrow Agreement, and any other agreements, instruments or documents entered into pursuant to this Agreement.

"Transfer Taxes" shall have the meaning set forth in Section 8.1(a).

Section 1.2 Other Definitions and Interpretive Matters.

(a)    Unless otherwise indicated to the contrary in this Agreement by the context or use thereof:

(i)    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a day other than a Business Day, the period in question shall end on the next succeeding Business Day.

(ii)    Any reference in this Agreement to $ means U.S. dollars.

(iii)    Unless the context otherwise requires, all capitalized terms used in the Exhibits and Schedules shall have the respective meanings assigned in this Agreement. No reference to or disclosure of any item or other matter in the Exhibits and Schedules shall be construed as an admission or indication that such item or other matter is material or that such item or other matter is required to be referred to or disclosed in the Exhibits and Schedules. No disclosure in the Exhibits and Schedules relating to any possible breach or violation of any Contract or Law shall be construed as an admission or indication that any such breach or violation exists or has actually occurred. Any information, item, or other disclosures set forth in any Schedule shall be deemed to have been set forth in all other applicable Schedules if the relevance of such disclosure to such other Schedule is reasonably apparent from the facts specified in such disclosure.  All Exhibits and Schedules attached or annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.

(iv)    Any reference in this Agreement to gender includes all genders, and words importing the singular number also include the plural and vice versa.

(v)    The provision of a table of contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience

7

of reference only and shall not affect or be utilized in the construction or interpretation of this Agreement. All references in this Agreement to any "Section," "Article," "Schedule," or "Exhibit" are to the corresponding Section, Article, Schedule, or Exhibit of or to this Agreement unless otherwise specified.

(vi)    Words such as "herein," "hereof and "hereunder" refer to this Agreement as whole and not merely to a subdivision in which such words appear, unless the context otherwise requires.

(vii)    The word "including" or any variation thereof means "including, without limitation," and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(b)    No Strict Construction. Buyer, on the one hand, and Seller, on the other hand, participated jointly in the negotiation and drafting of this Agreement, and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by Buyer, on the one hand, and Seller, on the other hand, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement. Without limitation as to the foregoing, no rule of strict construction construing ambiguities against the draftsperson shall be applied against any Person with respect to this Agreement.

## ARTICLE II
## PURCHASE AND SALE

Section 2.1    Purchase and Sale of the Acquired Assets. Upon the terms and subject to the conditions of this Agreement, on the Closing Date, Seller shall sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to Buyer, and Buyer shall purchase, all right, title, and interest of Seller, free and clear of Encumbrances other than Permitted Encumbrances, in, to, or under (collectively, the "Acquired Assets"):

(a)    the Intellectual Property;

(b)    the Customer Data;

(c)    all Documents associated with the right to use the assets referenced in this Section 2.1;

(d)    all goodwill associated with the assets referenced in this Section 2.1;

(e)    all Claims of Seller (other than Avoidance Actions) to the extent arising out of, or relating to, the assets referenced in this Section 2.1; and

(f)    to the extent transferable (including transfers permitted with notice and consent), all rights of Seller under non-disclosure or confidentiality, non-compete, or non-solicitation Contracts relating to any asset referenced in this Section 2.1.

8

Section 2.2    Excluded Assets. Notwithstanding anything herein to the contrary, the Buyer shall acquire no right, title, or interest in any assets, properties, rights, interests, or claims of any kind or description of Seller that are not Acquired Assets (collectively, the "Excluded Assets"). There are no assumed liabilities.

Section 2.3    Further Assurances. At the Closing, Seller shall, at its own cost and expense and upon Buyer's request, execute and deliver to Buyer such other instruments of transfer as shall be reasonably necessary to vest in Buyer title to the Acquired Assets, and Seller, on the one hand, and Buyer, on the other hand, shall, at their own cost and expense, use their respective commercially reasonable efforts to take, or cause to be taken, all appropriate action, do or cause to be done all things necessary under applicable Law, and execute and deliver such instruments and documents and to take such other actions, as may be required to consummate the transactions contemplated by this Agreement at or after the Closing; provided that nothing in this Section 2.4 shall prohibit Seller from continuing the cessation of or the winding up of Seller's affairs following the Closing. In furtherance and not in limitation of the foregoing, in the event that any of the Acquired Assets shall not have been conveyed at Closing, Seller shall, at its own cost and expense, use commercially reasonable efforts to convey such Acquired Assets to Buyer as promptly as practicable after the Closing.

## ARTICLE III
## PURCHASE PRICE

Section 3.1    Purchase Price. The purchase price (the "Purchase Price") for the purchase, sale, assignment and conveyance of Seller's right, title, and interest in, to, and under the Acquired Assets shall consist of: cash in the amount of the Cash Consideration.

(a)         .

Section 3.2    Minimum Deposit. Buyer has delivered to the Seller, to be held in escrow, the Minimum Deposit in immediately available funds pursuant to the Escrow Agreement. The Minimum Deposit shall not be subject to any lien, attachment, trustee process, or any other judicial process of any creditor of Seller or Buyer. The Minimum Deposit shall be retained by Seller at the Closing (and deducted from the Purchase Price due and payable at the Closing), or if this Agreement is terminated, treated in the manner set forth in Section 11.2. There are no  costs associated with the Escrow Agreement.

Section 3.3    Closing Date Payments. At the Closing,  Buyer shall pay to Seller cash by wire transfer of immediately available funds in an amount equal to the Cash Consideration minus the Minimum Deposit..

Section 3.4    [This paragraph intentionally Omitted]

Section 3.5    [This paragraph left intentionally Omitted].

## ARTICLE IV
## CLOSING

9

Section 4.1    Closing Date. Upon the terms and subject to the conditions hereof, the closing of the sale of the Acquired Assets (the "Closing") shall take place electronically no later than the first (1st) Business Day following the date on which the conditions set forth in Article IX and Article X have been satisfied or (if permissible) waived (other than the conditions that by their nature are to be satisfied by actions taken at the Closing, but subject to the satisfaction or (if permissible) waiver of such conditions), or at such other place or time as Buyer and Seller may mutually agree. The date and time at which the Closing actually occurs is referred to as the "Closing Date."

Section 4.2    Buyer's Deliveries. At the Closing, Buyer shall deliver to Seller:

(a)    the closing date payment in accordance with clause (a) of Section 3.3:

(b)    each other Transaction Document not previously executed to which Buyer is a party, duly executed by Buyer;

(c)    the certificates of Buyer to be received by Seller pursuant to Sections 10.1 and 10.2: and

(d)    such assignments and other good and sufficient instruments of assumption and transfer, in form reasonably satisfactory to Seller, as Seller may reasonably request to transfer and assign the Acquired Assets and assumed liabilities to Buyer.

Section 4.3    Seller's Deliveries. At the Closing, Seller shall deliver to Buyer:

(a)    each other Transaction Document to which Seller is a party, duly executed by Seller;

(b)    a copy of the Sale Order entered by the Bankruptcy Court;

(c)    the certificates of Seller to be received by Buyer pursuant to Sections 9.1 and 9.2: and

(d)    such bills of sale, deeds, endorsements, assignments, UCC terminations and other filings and other good and sufficient instruments, in form reasonably satisfactory to Buyer, which are necessary to vest in Buyer all the right, title and interest of Seller in, to or under any or all of the Acquired Assets free and clear of Encumbrances other than Permitted Encumbrances.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth in the Schedules, Seller hereby represents and warrants to Buyer that the statements contained in this Article V are true and correct as of the date hereof and shall be true and correct in all material respects as of the Closing Date (other than (i) such representations and warranties that are expressly made as of another date which shall have been true and correct

10

as of such date and (ii) any representations and warranties limited by materiality which shall be true and correct in all respects) as though made:

Section 5.1    Organization and Good Standing. Seller is an entity duly organized, validly existing and in good standing under the Laws of the jurisdiction of Seller's organization. Subject to the limitations imposed on Seller as a result of the Filing, Seller has the requisite limited liability company power and authority to own or lease and to operate and use Seller's properties and to carry on its business as presently conducted. Seller is not in default under or in violation of any provision of its organizational documents.

Section 5.2    Authority; Validity; Consents.  Seller has, subject to requisite Bankruptcy Court approval, as applicable, the requisite limited liability company power and authority necessary to enter into and perform Seller's obligations under this Agreement and the other Transaction Documents to which Seller is a party and to consummate the transactions contemplated hereby and thereby. This Agreement has been duly and validly executed and delivered by Seller and each other Transaction Document required to be executed and delivered by Seller at the Closing will be duly and validly executed and delivered by Seller at the Closing. Subject to requisite Bankruptcy Court approval, as applicable, this Agreement and the other Transaction Documents constitute, with respect to Seller, the legal, valid and binding obligations of Seller, enforceable against Seller in accordance with their respective terms, except as such enforceability is limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity. Subject to, and after giving effect to, requisite Bankruptcy Court approval (including, without limitation, the Sale Order), as applicable, and except (a) for entry of the Sale Order and (b) for notices, filings and consents required in connection with the Bankruptcy Case, Seller is not required to give any notice to, make any filing with or obtain any consent from any Person (including any Governmental Authority) in connection with the execution and delivery of this Agreement and the other Transaction Documents or the consummation or performance of any of the transactions contemplated hereby and thereby.

Section 5.3    No Conflicts. The execution, delivery and performance by Seller of this Agreement and the other Transaction Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) conflict with or result in a violation or breach of, or default under, any provision of the organizational documents of Seller; (b) conflict with or result in a violation or breach of any provision of any Law or Governmental Authorization applicable to Seller, its business or the Acquired Assets; (c) conflict with, result in a violation or breach of, constitute a default or an event that, with or without notice or lapse of time or both, would constitute a default under, result in the acceleration of or create in any party the right to accelerate, terminate, modify or cancel any Contract or Governmental Authorization to which Seller is a party or by which Seller or its business is bound or to which any of the Acquired Assets are subject; or (d) result in the creation or imposition of any Encumbrance other than Permitted Encumbrances on the Acquired Assets.

Section 5.4    Material Contracts. Schedule 5.4 lists each Contracts by which any of the Acquired Assets are bound or affected or to which Seller is a party or by which it is bound in

11

connection with the Acquired Assets (such Contracts being "Material Contracts"). Each Material Contract is valid and binding on Seller in accordance with its terms and is in full force and effect. None of Seller or, to Seller's Knowledge, any other party thereto is in breach of or default under (or is alleged to be in breach of or default under), or has provided or received any notice of any intention to terminate, any Material Contract. No event or circumstance has occurred that, with notice or lapse of time or both, would constitute an event of default under any Material Contract or result in a termination thereof or would cause or permit the acceleration or other changes of any right or obligation or the loss of any benefit thereunder. Complete and correct copies of each Material Contract (including all modifications, amendments and supplements thereto and waivers thereunder) have been made available to Buyer. There are no material disputes pending or threatened under any Contract included in the Acquired Assets.

Section 5.5    Title to Acquired Assets. Immediately prior to Closing, Seller will have and, upon delivery to Buyer on the Closing Date of the instruments of transfer contemplated by Section 4.3, and subject to the terms of the Sale Order, Seller will thereby transfer to Buyer, marketable title to or, a valid contractual interest in all of the Acquired Assets free and clear of all Encumbrances.

Section 5.6    Taxes. There are no Encumbrances for Taxes on any of the Acquired Assets, nor is any taxing authority in the process of imposing any Encumbrance for Taxes on any of the Acquired Assets. All Tax Returns in relation to the Acquired Assets required to be filed by Seller for any period prior to the Closing Date have been, or will be, timely filed. Such Tax Returns are, or will be, true, complete and correct in all respects. All Taxes due and owing by Seller in relation to the Acquired Assets (whether or not shown on any Tax Return) have been, or will be, timely paid. Seller is not a party to any Action by any taxing authority. There are no pending or threatened Actions by any taxing authority.

Section 5.7    Legal Proceedings. Except for the Bankruptcy Case  there is no Proceeding or Order pending, outstanding or, to Seller's Knowledge, threatened against Seller that (a) seeks to restrain or prohibit or otherwise challenge or delay the consummation, legality or validity of the transactions contemplated hereby or (b) relates to or affects the Acquired Assets. There are no outstanding Orders or unsatisfied judgments, penalties or awards against, relating to or affecting the Acquired Assets and, to the Knowledge of Seller, no event has occurred or circumstances exist that may give rise to or serve as a basis for any such Proceeding or Order. Seller has materially complied, and is now materially complying, with all Laws applicable to the Acquired Assets, including the ownership and use thereof.

Section 5.8    Brokers or Finders. Except for Hilco Streambank, Seller has not incurred any obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement, the other Transaction Documents or the transactions contemplated hereby or thereby for which Buyer is or will become liable, and Seller shall indemnify and hold harmless Buyer from any claims with respect to any such fees or commissions.

Section 5.9    Intellectual Property.

12

3032433.4

(a)       Schedule 5.9(a) lists all issued registered Trademarks included in the Acquired Assets. Except as noted on Schedule 5.9(a), all required filings and fees related to the registered Intellectual Property have been timely filed with and paid to the relevant Governmental Authorities and authorized registrars, and all Intellectual Property registrations are otherwise in good standing. Seller has provided Buyer with true and complete copies of file histories, documents, certificates, office actions, correspondence and other materials related to all such Intellectual Property registrations.

(b)       Schedule 5.9(b) lists all Intellectual Property Agreements. Seller has provided Buyer with true and complete copies of all such Intellectual Property Agreements, including all modifications, amendments and supplements thereto and waivers thereunder. Each listed Intellectual Property Agreement is valid and binding on Seller in accordance with its terms and is in full force and effect. Neither the Seller nor, to Seller's Knowledge, is any other party thereto is in breach of or default under (or is alleged to be in breach of or default under), or has provided or received any notice of breach or default of or any intention to terminate, any such Intellectual Property Agreement. No event or circumstance has occurred that, with notice or lapse of time or both, would constitute an event of default under any listed Intellectual Property Agreement or result in a termination thereof or would cause or permit the acceleration or other changes of any right or obligation or the loss of any benefit thereunder. For purposes of this Agreement, "Intellectual Property Agreements" means all licenses, sublicenses, consent to use agreements, settlements, coexistence agreements, covenants not to sue, permissions and other Contracts (including any right to receive or obligation to pay royalties or any other consideration), whether written or oral, relating to any Intellectual Property included within the Acquired Assets to which Seller is a party, beneficiary or otherwise bound.

(c)       Seller is the sole and exclusive legal and beneficial, and with respect to the Intellectual Property registrations included within the Acquired Assets, record, owner of all right, title and interest in and to the Intellectual Property included within the Acquired Assets, in each case, free and clear of Encumbrances. The consummation of the transactions contemplated hereunder will not result in the loss or impairment of or payment of any additional amounts with respect to, nor require the consent of any other Person in respect of, the Buyer's right to own, use or hold for use any such Intellectual Property.

(d)       Seller's rights in the Intellectual Property included within the Acquired Assets are valid, subsisting and enforceable. Seller has taken commercially reasonable steps to maintain such Intellectual Property and to protect and preserve the confidentiality of all trade secrets included in such Intellectual Property.

(e)       The conduct of Seller's business as currently and formerly conducted, and the Intellectual Property included within the Acquired Assets and Intellectual Property licensed under the Intellectual Property Agreements as currently or formerly owned, licensed or used by Seller, have not infringed, misappropriated, diluted or otherwise violated, and have not, do not and will not infringe, dilute, misappropriate or otherwise violate, the Intellectual Property or other rights of any Person. To Seller's Knowledge, no Person has infringed, misappropriated,

13

diluted or otherwise violated, or is currently infringing, misappropriating, diluting or otherwise violating, any Intellectual Property included within the Acquired Assets.

(f)    There are no Claims (including any oppositions, interferences or re-examinations) settled, pending or threatened (including in the form of offers to obtain a license): (i) alleging any infringement, misappropriation, dilution or violation of the Intellectual Property of any Person by Seller in connection with its business; (ii) challenging the validity, enforceability, registrability or ownership of any Intellectual Property included within the Acquired Assets or Seller's rights with respect to any such Intellectual Property; or (iii) by Seller or any other Person alleging any infringement, misappropriation, dilution or violation by any Person of any such Intellectual Property. Seller is not subject to any outstanding or prospective Order (including any motion or petition therefor) that does or would restrict or impair the use of any such Intellectual Property.

(g)    Schedule 5.9(g) identifies and describes each distinct electronic or other database containing (in whole or in part) Personal Data related to the Acquired Assets maintained by or for Seller at any time ("Seller Databases"), the types of Personal Data in each such database, the means by which the Personal Data was collected, and the security policies that have been adopted and maintained with respect to each such database. Except as described in Schedule 5.9(g), no material breach of violation of any such security policy has occurred in the past two (2) years or is occurring or, to the Knowledge of Seller, is threatened, and in the past two (2) years there has not been, nor is there currently any unauthorized or illegal use of or access to any of the data or information in any of the Seller Databases. Except as set forth on Schedule 5.9(g), Seller has complied at all times and in all material respects with all of Seller's privacy policies and with all applicable Laws pertaining to privacy or Personal Data. For purposes of this Agreement, "Personal Data" means a natural person's name, street address, telephone number, email address, photograph, social security number, driver's license number, passport number or customer or account number or any other piece of information that allows the identification of a natural person.

Section 5.10   No Other Representations or Warranties; Full Disclosure; No Survival. Buyer acknowledges that, except for the representations and warranties contained in this Article V, neither Seller nor any other Person on behalf of Seller makes any express or implied representation or warranty with respect to Seller or with respect to any information provided by or on behalf of Seller to Buyer. The representations and warranties of Seller will expire upon the earlier of the Closing Date or the termination of this Agreement.

**ARTICLE VI**
**REPRESENTATIONS AND WARRANTIES OF BUYER**

Buyer hereby represents and warrants to Seller that the statements contained in this Article VI are true and correct as of the date hereof and shall be true and correct as of the Closing Date (other than such representations and warranties that are expressly made as of another date which shall have been true and correct as of such date) as though made:

14

Section 6.1      Organization and Good Standing.  Buyer is a corporation , duly organized, validly existing and in good standing under the laws of the jurisdiction of Buyer's organization. Buyer has the requisite power and authority to own or lease and to operate and use Buyer's properties and to carry on Buyer's business as now conducted.

Section 6.2      Authority; Validity; Consents. Buyer has the requisite power and authority necessary to enter into and perform Buyer's obligations under this Agreement and the other Transaction Documents to which it is a party and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance of this Agreement by Buyer and the consummation by Buyer of the transactions contemplated herein have been duly and validly authorized by all requisite company actions in respect thereof. This Agreement has been duly and validly executed and delivered by Buyer and each other Transaction Document to which Buyer is a party will be duly and validly executed and delivered by Buyer at the Closing. This Agreement and the other Transaction Documents to which Buyer is a party constitute the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with their respective terms, except as such enforceability is limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity. Subject to requisite Bankruptcy Court approval, as applicable. Buyer is not and will not be required to give any notice to or obtain any consent from any Person in connection with the execution and delivery of this Agreement and the other Transaction Documents to which it is a party or the consummation or performance of any of the transactions contemplated hereby or thereby.

Section 6.3      No Conflict. When the consents and other actions described in Section 6.2 have been obtained and taken, the execution and delivery of this Agreement and the other Transaction Documents and the consummation of the transactions provided for herein and therein will not result in the breach of any of the terms and provisions of, or constitute a default under, or conflict with, or cause any acceleration of any obligation of Buyer under (a) any agreement, indenture, or other instrument to which it is bound, (b) the certificate of formation of Buyer, (c) any Order or (d) any Law.

Section 6.4      Availability of Funds   Buyer has and will have at the Closing sufficient cash in immediately available funds to pay the Purchase Price and any other costs, fees and expenses required to be paid by it under this Agreement and the other Transaction Documents..

Section 6.5      Litigation. There are no Proceedings pending or, to the knowledge of Buyer, threatened, that would affect in any material respect Buyer's ability to perform Buyer's obligations under this Agreement or any other Transaction Documents or to consummate the transactions contemplated hereby or thereby.

Section 6.6      Brokers or Finders. Neither Buyer nor any Person acting on behalf of Buyer has paid or become obligated to pay any fee or commission to any broker, finder, investment banker, agent or intermediary for or on account of the transactions contemplated by this Agreement for which Seller is or will become liable, and Buyer shall hold harmless and indemnify Seller from any claims with respect to any such fees or commissions.

15

Section 6.7      Condition of Acquired Assets; Representations. Notwithstanding anything contained in this Agreement to the contrary, Buyer acknowledges and agrees that Seller is not making any representations or warranties whatsoever, express or implied, beyond those expressly given by Seller in Article V (subject to the disclosures set forth on the Schedules), and Buyer acknowledges and agrees that, except for the representations and warranties contained therein, the Acquired Assets are being transferred on a "where is" and, as to condition, "as is" basis. Buyer acknowledges that it has conducted to Buyer's satisfaction Buyer's own independent investigation of Seller's business and, in making the determination to proceed with the transactions contemplated by this Agreement, Buyer has relied on the representations and warranties expressly given by Seller in Article V and the results of Buyer's own independent investigation. In connection with Buyer's investigation. Buyer has received or may receive from Seller certain projections, forward-looking statements and other forecasts and certain business plan information. Buyer acknowledges that there are uncertainties inherent in attempting to make such estimates, projections and other forecasts and plans, that Buyer is familiar with such uncertainties, that Buyer is taking full responsibility for making Buyer's own evaluation of the adequacy and accuracy of all estimates, projections and other forecasts and plans so furnished to Buyer (including the reasonableness of the assumptions underlying such estimates, projections, forecasts or plans), and that Buyer shall have no claim against anyone with respect thereto. Accordingly, Buyer acknowledges that Seller makes no representation or warranty with respect to such estimates, projections, forecasts or plans (including the reasonableness of the assumptions underlying such estimates, projections, forecasts or plans).

## ARTICLE VII
## ACTIONS PRIOR TO THE CLOSING DATE

Section 7.1      Operations Prior to the Closing Date. Seller covenants and agrees that, except (i) as expressly contemplated by this Agreement, (ii) with the prior written consent of Buyer (which consent, other than with respect to Section 7.1(b)(ii), shall not be unreasonably withheld or delayed), (iii) as required by the Bankruptcy Court or (iv) as otherwise required by Law, after the Effective Date and prior to the Closing Date:

(a)      Seller shall use commercially reasonable efforts, taking into account Seller's status as a debtor-in-possession in the Bankruptcy Case, to maintain and preserve the Acquired Assets in their present condition and, without limiting the generality of the foregoing,

(b)      Seller shall not:

(i)      sell, lease (as lessor), transfer or otherwise dispose of, or mortgage or pledge, or voluntarily impose or suffer to be imposed any Encumbrance (other than assumed liabilities and Permitted Encumbrances) on, any Acquired Asset;

(ii)      cancel or compromise any material claim or waive or release any material right, in each case, that is a claim or right related to an Acquired Asset; or enter into any agreement or commitment to take any action prohibited by this Section 7.1.

16

Section 7.2        Bankruptcy Court Filings and Approval.

(a)        Seller shall use Seller's commercially reasonable efforts to obtain entry of the Sale Order and such other relief from the Bankruptcy Court as may be necessary or appropriate in connection with this Agreement and the consummation of the transactions contemplated by this Agreement including, to the extent required, the retention of a Consumer Ombudsman. Buyer agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order and, consistent with Section 2.4, a finding by the Bankruptcy Court that  Buyer in acquiring the Acquired Assets Buyer is entitled to a finding that it is a good faith purchaser within the meaning of Section 363(m) of the Bankruptcy Code. As soon as reasonably practicable after the parties execute this Agreement, but in any event no later than five (5) Business Days after the parties execute this Agreement, Seller shall file the Sale Motion with the Bankruptcy Court together with required supporting papers and required notices.

(b)        Seller and Buyer acknowledge that this Agreement and the sale of the Acquired Assets are subject to Bankruptcy Court approval. Seller and Buyer acknowledge that to obtain such approval, Seller must demonstrate that they have taken reasonable steps to obtain the highest or otherwise best offer possible for the Acquired Assets and Buyer hereby agrees to provide all appropriate assurances thereof necessary in order to obtain the foregoing approvals.

(c)        Seller shall give all notices required to be given by applicable Law, to all Persons entitled thereto, of all motions (including the motions seeking entry of the Sale Order), orders, hearings and other proceedings relating to this Agreement and the transactions contemplated hereby and thereby and such additional notice as ordered by the Bankruptcy Court or as Buyer may reasonably request. Seller shall promptly provide Buyer with copies of all communications from the Bankruptcy Court relating to the motions seeking entry of the Sale Order.

(d)        In the event an appeal is taken or a stay pending appeal is requested, from the Sale Order, Seller shall immediately notify Buyer of such appeal or stay request and shall provide to Buyer promptly a copy of the related notice of appeal or order of stay. Seller shall also provide Buyer with written notice of any motion or application filed in connection with any appeal from or stay request in respect of such order. Seller and Buyer shall use each of their respective commercially reasonable efforts to defend such appeal or stay request and obtain an expedited resolution of such appeal.

(e)        From and after the date hereof, Seller shall not take any action that is intended to, or fail to take any action the intent of which failure to act is to, result in the reversal, voiding, modification or staying of the Sale Order.

Section 7.3        Investigation of Seller's Business by Buyer. Between the date hereof and the earlier of the termination of this Agreement and the Closing Date, Seller shall permit Buyer's authorized representatives reasonable access during regular business hours and upon reasonable notice, to the offices, properties, agreements and other documentation and records with respect to

17

the Acquired Assets and the assumed liabilities, all to the extent Buyer reasonably requests. Any such investigation shall be conducted in a manner so as not to interfere with the operations of Seller. Seller shall use its commercially reasonable efforts to cause their respective outside accountants and outside counsel to cooperate with Buyer in its investigation.

Section 7.4    Third Party Consents and Acknowledgements. Between the date hereof and the earlier of the termination of this Agreement and the Closing Date, Seller shall use its commercially reasonable efforts to obtain all third party consents required for the consummation of the transactions contemplated hereby to the extent such consents are not provided for or satisfied by the Sale Order.

Section 7.5    Governmental Approvals. Seller and Buyer shall act diligently and reasonably, and shall cooperate with each other, to do or cause to be done, all things necessary, proper or advisable consistent with applicable confidentiality and legal requirements to cause the conditions precedent to the Closing to be satisfied and to cause the Closing to occur, including to secure any consents and approvals of any Governmental Authority required to be obtained by them, in order to permit the consummation of the transactions contemplated by this Agreement, or to otherwise satisfy the conditions precedent set forth in this Agreement, in each case as necessary to the extent such consents are not provided for or satisfied by the Sale Order; provided, however, that Seller shall not make any agreement or understanding affecting the Acquired Assets as a condition for obtaining any such consents or approvals except with the prior written consent of Buyer.

Section 7.6    Notice of Certain Events. From the date hereof until the Closing, Seller shall promptly notify Buyer in writing of (a) any fact, circumstance, event or action the existence, occurrence or taking of which has had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect; (b) has resulted in, or could reasonably be expected to result in, any representation or warranty made by Seller hereunder not being true and correct; (c) has resulted in, or could reasonably be expected to result in, the failure of any of the conditions precedent set forth in this Agreement to be satisfied; or (d) any notice or other communication from any Person alleging that the consent of a third party is or may be required in connection with the transactions contemplated by this Agreement.

**ARTICLE VIII**
**ADDITIONAL AGREEMENTS**

Section 8.1    Taxes.

(a)    Any sales, use, property transfer or gains, documentary, stamp, registration, recording or similar Tax (including, for certainty, goods and services tax, harmonized sales tax and land transfer tax) payable in connection with the sale or transfer of the Acquired Assets ("Transfer Taxes") shall be borne by Buyer and, to the extent Seller is required by applicable Law to pay Transfer Taxes, such Transfer Taxes shall be paid by Buyer to Seller at Closing. Seller and Buyer shall use reasonable efforts and cooperate in good faith to exempt the sale and transfer of the Acquired Assets from any such Transfer Taxes. Seller shall prepare and

18

file all necessary Tax Returns or other documents with respect to all such Transfer Taxes; provided, however, that in the event any such Tax Return requires execution by Buyer, Seller shall prepare and deliver to Buyer a copy of such Tax Return at least three (3) Business Days before the due date thereof, and Buyer shall promptly execute such Tax Return and deliver it to Seller, which shall cause it to be filed.

(b)    Buyer and Seller agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Acquired Assets (including access to Documents) as is reasonably necessary for the filing of all Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any taxing authority and the prosecution or defense of any claims, suit or proceeding relating to any Tax; provided, however, that (other than as required pursuant to this Section 8.1(b) neither Buyer nor Seller shall be required to disclose the contents of its income tax returns to any Person. Any expenses incurred in furnishing such information or assistance pursuant to this Section 8.1(b) shall be borne by the Party requesting it,

(c)    Notwithstanding any other provisions in this Agreement, Buyer and Seller hereby waive compliance with all "bulk sales," "bulk transfer" and similar laws that may be applicable with respect to the sale and transfer of any or all of the Acquired Assets to Buyer.

Section 8.2    Payments Received. Seller, on the one hand, and Buyer, on the other hand, each agree that, after the Closing, each will hold and will promptly transfer and deliver to the other, from time to time as and when received by them, any cash, checks with appropriate endorsements (using each of their best efforts not to convert such checks into cash) or other property that they may receive on or after the Closing which properly belongs to the other and will account to the other for all such receipts.

Section 8.3    Confidentiality. From and after the Closing, Seller shall, and shall cause its affiliates to, hold, and shall use its reasonable best efforts to cause its or their respective representatives to hold, in confidence any and all information, whether written or oral, concerning the Acquired Assets, except to the extent that Seller can show that such information (a) is generally available to and known by the public through no fault of Seller, any of its affiliates or their respective representatives; or (b) is lawfully acquired by Seller, any of its affiliates or their respective representatives from and after the Closing from sources which are not prohibited from disclosing such information by a legal, contractual or fiduciary obligation. If Seller or any of its affiliates or their respective representatives are compelled to disclose any information by judicial or administrative process or by other requirements of Law, Seller shall promptly notify Buyer in writing and shall disclose only that portion of such information which Seller is advised by its counsel in writing is legally required to be disclosed, provided that Seller shall use reasonable best efforts to obtain an appropriate protective order or other reasonable assurance that confidential treatment will be accorded such information.

## ARTICLE IX
## CONDITIONS PRECEDENT TO THE OBLIGATION OF BUYER TO CLOSE

19

Buyer's obligation to consummate the transactions contemplated by this Agreement is subject to the satisfaction or waiver, at or prior to the Closing, of each of the following conditions:

Section 9.1      Accuracy of Representations, The representations and warranties of Seller contained in <u>Article V</u> shall be true and correct as of the date hereof and in all material respects as of the Closing Date as though made on and as of the Closing Date (except that (i) those representations and warranties which address matters only as of a particular date need only be true and correct as of such date and (ii) any representations and warranties qualified by materiality shall be true and correct in all respects). Buyer shall have received a certificate of Seller, signed by a duly authorized officer of Seller, to that effect.

Section 9.2      Seller's Performance. Seller shall have performed and complied with in all material respects the covenants and agreements that Seller is required to perform or comply with pursuant to this Agreement at or prior to the Closing, and Buyer shall have received a certificate of Seller to such effect signed by a duly authorized officer of Seller.

Section 9.3      No Order. No Governmental Authority shall have enacted, issued, promulgated or entered any Order which is in effect and has the effect of making illegal or otherwise prohibiting the consummation of the transactions contemplated by this Agreement (a "Closing Legal Impediment"); provided, however, that prior to asserting this condition Buyer shall have taken all actions required by Section 7.2 to prevent the occurrence or entry of any such Closing Legal Impediment and to remove or appeal as promptly as possible any such Closing Legal Impediment.

Section 9.4      Governmental Authorizations. Any applicable waiting period under any applicable material antitrust or competition Law shall have expired or been terminated and any other material approval under any applicable antitrust or competition Law shall have been received.

Section 9.5      Seller's Deliveries. Each of the deliveries required to be made to Buyer pursuant to Section 4.3 shall have been so delivered.

Section 9.6      Sale Order. The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall be a final order and not subject to a stay pending appeal.

Section 9.7      Other Conditions. No Proceeding shall have been commenced against Buyer or Seller that would prevent the Closing. All approvals, consents and waivers necessary to consummate the transactions contemplated by this Agreement shall have been received.

## ARTICLE X
## CONDITIONS PRECEDENT TO THE OBLIGATION OF SELLER TO CLOSE

Seller's obligation to consummate the transactions contemplated by this Agreement is subject to the satisfaction or waiver, at or prior to the Closing, of each of the following conditions:

20

Section 10.1    Accuracy of Representations. The representations and warranties of Buyer contained in <u>Article VI</u> shall be true and correct as of the date hereof and in all material respects as of the Closing Date as though made on and as of the Closing Date (except that (i) those representations and warranties which address matters only as of a particular date need only be true and correct as of such date and (ii) any representations and warranties qualified by materiality shall be true and correct in all respects). Seller shall have received a certificate of Buyer, signed by a duly authorized officer of Buyer, to that effect.

Section 10.2    Buyer's Performance. Buyer shall have performed and complied with in all material respects the covenants and agreements that Buyer is required to perform or comply with pursuant to this Agreement at or prior to the Closing, and Seller shall have received a certificate of Buyer to such effect signed by a duly authorized officer thereof.

Section 10.3    No Order. No Closing Legal Impediment shall be in effect, provided. however, that prior to asserting this condition Seller shall have taken all actions required by Section 7.2 to prevent the occurrence or entry of any such Closing Legal Impediment and to remove or appeal as promptly as possible any such Closing Legal Impediment.

Section 10.4    Governmental Authorizations. Any applicable waiting period under any material applicable antitrust or competition Law shall have expired or been terminated and any other material approval under any applicable antitrust or competition Law shall have been received.

Section 10.5    Buyer's Deliveries. Each of the deliveries required to be made to Seller pursuant to Section 4.2 shall have been so delivered.

Section 10.6    Sale Order in Effect. The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall not be subject to a stay pending appeal.

**ARTICLE XI**
**TERMINATION**

Section 11.1    Termination Events. Anything contained in this Agreement to the contrary notwithstanding (other than as provided in the last sentence of this Section 11.1 this Agreement may be terminated at any time prior to the Closing Date:

(a)    by mutual written consent of Seller and Buyer; or

(b)    by either Seller or Buyer:

(i)    if the Bankruptcy Court does not approve this Agreement for any reason or if a Governmental Authority issues a final, non-appealable ruling or Order permanently prohibiting the transactions contemplated hereby, provided. however, that the right to terminate this Agreement pursuant to this Section 11.1(b)(i) shall not be available to any Party whose breach of any of its representations, warranties, covenants or agreements contained herein results in such failure to approve, such ruling or Order;

21

(ii)      if the Closing shall not have occurred by the close of business on November 6, 2017 (the "Outside Date"): provided, however, that the right to terminate this Agreement pursuant to this Section 1l.l(b)(ii) shall not be available to any Party whose breach of any of such Party's representations, warranties, covenants, or agreements contained herein results in the failure of the Closing to be consummated by such time; provided, further, that if as of the Outside Date, all of the conditions precedent to the Closing other than the conditions set forth in Sections 9.4 and 10.4 (and other than those conditions that by their terms are to be satisfied at the Closing or on the Closing Date) shall have been satisfied as of the Outside Date, then Seller shall be entitled to extend the Outside Date until November 16, 2017, upon written notice to the Buyer, in which case the Outside Date shall be deemed for all purposes to be November 16,2017;

(iii)      if (A) the Sale Hearing is not held on or before October 26, 2017; provided, however, if the Sale Hearing is delayed due to the Bankruptcy Court's unavailability, the next Business Day on which the Bankruptcy Court is available, or (B) the Bankruptcy Court has not entered the Sale Order on or before October 26, 2017; provided, however, if approval of the Sale Order is delayed due to the Bankruptcy Court's unavailability, the next Business Day on which the Bankruptcy Court is available;

(iv)      if the Sale Order is vacated; or

(v)      if Seller enters into a definitive agreement with respect to an Alternative Transaction because Buyer is not the Successful Bidder at the Auction; provided, however, that if Buyer is the Next Highest Bidder and Seller notifies Buyer of same prior to Seller's entry into a definitive agreement with respect to an Alternative Transaction, then Buyer may not terminate this Agreement or withdraw its irrevocable offer unless and until the earlier of (a) when such Alternative Transaction has closed or (b) sixty (60) days after the date of the Auction; or

(c)      Seller (A) files any stand-alone plan of reorganization or liquidation that does not contemplate, the implementation or consummation of, the transactions provided for in this Agreement or (B) consummates an Alternative Transaction; or by Buyer:

(i)      in the event of any breach by Seller of any of Seller's agreements, covenants, representations or warranties contained herein that would result in the failure of a condition set forth in Article IX to be satisfied, and the failure of Seller to cure such breach by the earlier of (A) the Outside Date and (B) the date that is 15 days after receipt of the Buyer Termination Notice; provided, however, that (1) Buyer is not in breach of any of Buyer's representations, warranties, covenants or agreements contained herein in a manner that would result in the failure of a condition set forth in Article X to be satisfied, (2) Buyer notifies Seller in writing (the "Buyer Termination Notice") of Buyer's intention to exercise Buyer's rights under this Section ll.1(c)(i) as a result of the breach, and (3) Buyer specifies in the Buyer Termination Notice the representation, warranty, covenant or agreement contained herein of which Seller is allegedly in breach;

22

(ii)      if the Bankruptcy Case is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code and neither such dismissal nor conversion expressly contemplates the transactions provided for in this Agreement; or

(iii)     if any conditions to the obligations of Buyer set forth in <u>Article IX</u> shall have become incapable of fulfillment other than as a result of a breach by Buyer of any covenant or agreement contained in this Agreement; or

(d)      by Seller:

(i)       except as provided in Section 11.1(d)(iii), in the event of any breach by Buyer of any of Buyer's agreements, covenants, representations or warranties contained herein that would result in the failure of a condition set forth in <u>Article X</u> to be satisfied, and the failure of Buyer to cure such breach by the earlier of (A) the Outside Date and (B) the date that is 15 days after receipt of the Seller Termination Notice; provided, however, that Seller (1) is not itself in material breach of any of Seller's representations, warranties, covenants or agreements contained herein, (2) notify Buyer in writing (the "Seller Termination Notice") of Seller's intention to exercise Seller's rights under this Section 11.1(d)(i) as a result of the breach, and (3) specify in the Seller Termination Notice the representation, warranty, covenant or agreement contained herein of which Buyer is allegedly in breach;

(ii)      if Seller consummates a sale, transfer or other disposition of any portion of the Acquired Assets in a transaction or series of transactions with one or more Persons other than Buyer; or

(iii)     if the Sale Order with respect to the transactions contemplated by this Agreement has been entered and is not subject to any stay on enforcement and (A) Seller has provided Buyer with written notice that Seller is prepared to consummate the transactions contemplated by this Agreement, (B) the conditions to Closing in Article IX have been satisfied (or waived by Buyer), other than those conditions that by their nature can only be satisfied at Closing, and (C) the Closing Date does not occur within five (5) Business Days of Seller providing Buyer with such notice.

[For the avoidance of doubt, the Parties acknowledge and agree, that in the event that Seller determines, in Seller's reasonable discretion, that the last overbid submitted by Buyer is better than all other Qualified Bids as such Qualified Bids may be amended by an overbid submitted at the Auction, then within two Business Days following the conclusion of the Auction, Seller and Buyer shall enter into an amendment to this Agreement to reflect Buyer's last overbid; it being acknowledged and agreed that this Agreement shall not be deemed to have terminated by virtue of Buyer's having submitted the winning bid at the Auction.]

Section 11.2   Effect of Termination. If this Agreement is terminated pursuant to Section 1l.l(d)(i) or 11.1(d)(iii), the Minimum Deposit shall be retained by Seller, as Seller's sole and exclusive remedy therefor, for Seller's own account as damages specifically. If this Agreement is terminated pursuant to any provision of Section 11.1 other than either Section 1l.l(d)(i) or

23

Section 1l.1(d)(iii), Seller shall promptly (but in any event within two Business Days of such termination) instruct the Escrow Agent to return the Minimum Deposit to Buyer by wire transfer of immediately available funds.

Section 11.3   Break-Up Fee. In consideration for Buyer having expended considerable time and expense in connection with this Agreement, the negotiations hereof, and due diligence, Seller shall pay Buyer a break-up fee of $7,500 (the "Break-Up Fee") on the earlier of (i) the first Business Day following the consummation of an Alternative Transaction and (ii) five business days after the Outside Date.  The Break-Up Fee payable under this Section shall be paid from the proceeds of the Alternative Transaction.  Return of the Minimum Deposit and the payment of the Break-Up Fee shall be Buyer's sole and exclusive monetary remedy upon the occurrence of the applicable events set forth in this Section, but nothing in this Section shall be deemed to prohibit Buyer from taking any position under applicable law with respect to the approval of the sale to a competing bidder.

Section 11.4   Section 11.4. Overbid Protection. The sale of the Acquired Assets shall be subject to the Buyer's Overbid Protection.

## ARTICLE XII
## GENERAL PROVISIONS

Section 12.1   Notices. Any notice, consent or other communication required or permitted under this Agreement shall be in writing and shall be delivered (a) in person, (b) by a nationally recognized courier for overnight delivery service, or (c) by email or other electronic means, confirmed by telephone or return email (including an automated return receipt), to the persons indicated below. A notice or communication shall be deemed to have been effectively given (i) if in person, upon personal delivery to the Party to whom the notice is directed, (ii) if by nationally recognized courier, one Business Day after delivery to such courier, and (iii) if by email or other electronic means, when sent and confirmed by telephone or return email. Rejection or other refusal to accept or inability to deliver because of changed address of which no notice has been received shall also constitute receipt. Any such notice, election, demand, request or response shall be addressed as follows:

(a)   If to Seller, then to:

Vanity Shop of Grand Forks, Inc.

_____
_____

Attention: James Bennett

with a copy (which shall not constitute notice) to:

Vogel Law Firm
218 N.P. Avenue
Fargo, ND  58107-1389

24

Attention:  Jon Brakke
Phone:  (701) 237-6983
Facsimile:  (701) 476-7676
Email:  jbrakke@vogellaw.com


If to Buyer, then to:


Gary Holland

Associate General Counsel
Corporate & Securities

Ascena Retail Group, Inc.
933 MacArthur Boulevard
Mahwah, New Jersey 07430
Direct dial: (551) 777-6752
Gary.Holland@AscenaRetail.com


with a copy (which shall not constitute notice) to:


Joseph T. Moldovan
Morrison Cohen LLP
909 Third Avenue
New York, NY 10022
Tel: 212.735.8603
Cell: 917.693.9682
Fax: 917.522.3103
jmoldovan@morrisoncohen.com

Section 12.2   Amendment; Waiver. No amendment, modification or discharge of this Agreement, and no waiver hereunder, shall be valid or binding unless set forth in writing and duly executed by the Party against whom enforcement of the amendment, modification, discharge or waiver is sought and such amendment, modification, discharge or waiver is delivered substantially contemporaneously to each other Party. Any such waiver shall constitute a waiver only with respect to the specific matter described in such writing and shall in no way impair the rights of the Party granting such waiver in any other respect or at any other time. Neither the waiver by any of the Parties of a breach of or a default under any of the provisions of this Agreement, nor the failure by any of the Parties, on one or more occasions, to enforce any of the provisions of this Agreement or to exercise any right or privilege hereunder shall be construed as a waiver of any other breach or default of a similar nature, or as a waiver of any of such provisions, rights or privileges hereunder. No course of dealing between or among the

25

Parties shall be deemed effective to modify, amend or discharge any part of this Agreement or any rights to payment of any Party under or by reason of this Agreement.

Section 12.3   Entire Agreement. This Agreement (including the Schedules and the Exhibits) and the other Transaction Documents contain all of the terms, conditions and representations and warranties agreed to by the Parties relating to the subject matter of this Agreement and supersede all prior and contemporaneous agreements, understandings, negotiations, correspondence, undertakings and communications of the Parties or their representatives, oral or written, respecting such subject matter. The representations, warranties, covenants and agreements contained in this Agreement (including the Schedules and the Exhibits) and the other Transaction Documents are intended, among other things, to allocate the economic cost and the risks inherent in the transactions contemplated hereby and thereby, including risks associated with matters as to which the party making such representations and warranties has no knowledge or only incomplete knowledge, and such representations and warranties may be qualified by disclosures contained in the Schedules. Consequently, Persons other than the Parties may not rely upon the representations and warranties in this Agreement as characterizations of actual facts or circumstances as of the date of this Agreement or as of any other date.

Section 12.4   No Presumption as to Drafting. Each of the parties acknowledges that it has been represented by legal counsel in connection with this Agreement and the other Transaction Documents and the transactions contemplated hereby and thereby. Accordingly, any rule of law or any legal decision that would require interpretation of any claimed ambiguities in this Agreement or the Transaction Documents against the drafting party has no application and is expressly waived.

Section 12.5   Assignment. This Agreement, and the rights, interests and obligations hereunder, shall not be assigned by any Party by operation of law or otherwise without the express written consent of the other Parties (which consent maybe granted or withheld in the sole discretion of such other Party); provided, however, that Buyer shall be permitted, upon prior notice to Seller, to assign all or part of Buyer's rights or obligations hereunder to an Affiliate, but no such assignment shall relieve Buyer of Buyer's obligations under this Agreement.

Section 12.6   Severability. The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof. If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability.

Section 12.7   Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver.

26

(a)      Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement and all claims or causes of action (whether in contract, tort or otherwise) that may be based upon, arise out of or relate to this Agreement or the negotiation, execution or performance of this Agreement (including any claim or cause of action based upon, arising out of or related to any representation or warranty made in or in connection with this Agreement or as an inducement to enter into this Agreement) shall be governed by, and construed in accordance with, the laws of the State of North Dakota applicable to Contracts made and to be performed entirely in such state without regard to principles of conflicts or choice of laws or any other law that would make the laws of any other jurisdiction other than the State of North Dakota applicable hereto.

(b)      Without limitation of any Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby and (ii) any and all claims relating to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Proceeding; provided, however, that, if the Bankruptcy Case is closed, all Proceedings arising out of or relating to this Agreement shall be heard and determined in a North Dakota state court or a federal court sitting in the State of Delaware, and the Parties hereby (a) irrevocably and unconditionally submit to the exclusive jurisdiction of the District Court for the County of Cass, State of North Dakota and any state appellate court therefrom within the State of North Dakota (or in the event (but only in the event) that such court does not have subject matter jurisdiction over such Proceeding in the United States District Court for the District of North Dakota) with respect to all Proceedings arising out of or relating to this Agreement and the transaction contemplated hereby (whether based on contract, tort or other theory); (b) agree that all claims with respect to any such Proceeding shall be heard and determined in such courts and agrees not to commence any Proceeding relating to this Agreement or the transactions contemplated hereby (whether based on contract, tort or other theory) except in such courts; (c) irrevocably and unconditionally waive any objection to the laying of venue of any Proceeding arising out of this Agreement or the transactions contemplated hereby and irrevocably and unconditionally waives the defense of an inconvenient forum; and (d) agree that a final judgment in any such Proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law. The Parties agree that any violation of this Section 12.7(b) shall constitute a material breach of this Agreement.

(c)      EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY) EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER

27

PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTY HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 12.7.

Section 12.8   Counterparts. This Agreement may be executed in any number of counterparts (including via facsimile or other electronic transmission in portable document format (pdf)) with the same effect as if the signatures to each counterpart were upon a single instrument, and all such counterparts together shall be deemed an original of this Agreement. This Agreement shall become effective when, and only when, each Party shall have received a counterpart hereof signed by the other Party. Delivery of an executed counterpart hereof by means of facsimile or electronic transmission in portable document format (pdf) shall have the same effect as delivery of a physically executed counterpart in person.

Section 12.9   Parties in Interest: No Third Party Beneficiaries. Nothing in this Agreement shall confer any rights, benefits, remedies, obligations, liabilities or claims hereunder upon any Person not a Party or a permitted assignee of a Party.

Section 12.10  Non-Recourse. All claims, obligations, liabilities or causes of action (whether in contract or in tort, in law or in equity or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, be connected with or relate in any manner to this Agreement, the negotiation, execution or performance of this Agreement (including any representation or warranty made in connection with or as an inducement to this Agreement) or the transactions contemplated hereby may be made only against (and are those solely of) the Persons that are expressly identified as Parties to this Agreement. No other Person, including any of their Affiliates, directors, officers, employees, incorporators, members, partners, managers, stockholders, agents, attorneys, or representatives of, or any financial advisors or lenders to, any of the foregoing shall have any liabilities (whether in contract or in tort, in law or in equity, or granted by statute) for any claims, causes of action, obligations or liabilities arising under, out of, in connection with, or related in any manner to, this Agreement or based on, in respect of, or by reason of, this Agreement or its negotiation, execution, performance or breach.

Section 12.11  Schedules; Materiality. The inclusion of any matter in any Schedule shall be deemed to be an inclusion for all purposes of this Agreement, to the extent that such disclosure is sufficient to identify the Section to which such disclosure is responsive, but inclusion therein shall not be deemed to constitute an admission, or otherwise imply, that any such matter is material or creates a measure for materiality for purposes of this Agreement. The disclosure of any particular fact or item in any Schedule shall not be deemed an admission as to whether the fact or item is "material" or would constitute a "Material Adverse Effect."

Section 12.12  Specific Performance.   The Parties acknowledge and agree that (a) irreparable injury, for which monetary damages, even if available, would not be an adequate remedy, will occur in the event that any of the provisions of this Agreement are not performed in accordance with the specific terms hereof or are otherwise breached, and (b) the non-breaching Party or Parties shall therefore be entitled, in addition to any other remedies that may be

28

available, to obtain (without the posting of any bond) specific performance of the terms of this Agreement, if any Proceeding is brought by the non-breaching Party or Parties to enforce this Agreement, the Party in breach shall waive the defense that there is an adequate remedy at law.

Section 12.13 Survival. All covenants and agreements contained herein that by their terms are to be performed in whole or in part, or which prohibit actions, subsequent to the Closing shall survive the Closing in accordance with their terms. All other covenants and agreements contained herein, and all representations and warranties contained herein or in any certificated deliveries hereunder, shall not survive the Closing, and shall thereupon terminate.

*Signature Page Follows*

3032433.4

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed and delivered by their duly authorized representatives, all as of the Effective Date.

**MAURICES INCORPORATED**

By:_____
Name:
Title:

[SIGNATURE PAGE TO INTELLECTUAL PROPERTY ASSET PURCHASE AGREEMENT]

3032433.4

VANITY SHOP OF GRAND FORKS, INC.


By:_____
Name:
Title:

3032433.4

# EXHIBIT A

**Escrow Agreement**

3032433.4

# ESCROW AGREEMENT

This Escrow Agreement (the "Escrow Agreement"), is made and entered into this ____ day of September, 2017, by and among Vanity Shop of Grand Forks, Inc. (the "**Seller**" ) and Maurices Incorporated (the "**Buyer**").

## Recitals

WHEREAS, Seller and Buyer are parties to a certain Asset Purchase Agreement ("**Purchase Agreement**"), dated of even herewith, and to which this Escrow Agreement is attached as Exhibit A; capitalized terms used, but not separately defined herein, shall have the meanings ascribed in the Purchase Agreement;

WHEREAS, Buyer desires to purchase certain Intellectual Property (as defined in the Purchase Agreement) owned by Seller;

WHEREAS, pursuant to the terms of the Purchase Agreement, Buyer is required to deliver and has delivered a Minimum Deposit (as further defined in the Purchase Agreement) as payment towards the purchase of the Intellectual Property; and

WHEREAS, Buyer and Seller desire to hold the Minimum Deposit in escrow which shall be disbursed according to this Escrow Agreement and the Purchase Agreement.

## Agreement

NOW THEREFORE, in consideration of the covenants and agreements herein set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, agree as follows:

1.      The above recitals are true and correct and are incorporated herein by this reference.

2.      The Buyer has provided the Minimum Deposit to the Seller in good funds. Seller has deposited the funds into the Seller's operating account.

3.      The Seller will hold the Minimum Deposit in its operating account subject to Sections 3.2, 3.3, 11.2 and 11.3 of the Purchase Agreement. This Escrow Agreement shall remain in effect unless and until it is terminated as provided in Article XI of the Purchase Agreement.

4.      This Escrow Agreement shall be governed by and construed in accordance with the laws of the State of North Dakota.

5.      This Escrow Agreement may be executed in counterparts by facsimile or original, each of which when taken together shall constitute originals.

3032433.4

IN WITNESS WHEREOF, the parties have caused this Escrow Agreement to be executed and delivered by their duly authorized representatives.

**SELLER:**                                         **BUYER:**

**Vanity Shop of Grand Forks, Inc.**                **Maurices Incorporated**


By: _____           By: _____
Its: _____          Its: _____


Escrow Agent, by signing below, acknowledges receipt of the Minimum Deposit.

**ESCROW AGENT:**

**Vanity Shop of Grand Forks, Inc.**


By: _____
Its: _____

3032433.4

## **EXHIBIT B**

**(Form of Sale Order)**

**[Attached to Sale Motion]**

3032433.4